JENKINS ET AL., APPELLANTS, *v.*
CLARK ET AL.; PHYSICIAN'S EMERGENCY
. GROUP, INC., APPELLEE.

(No. 7181—Decided March 2, 1982.)

*Mr. John B. Huber* and *Mr. E. James Wampler,* for appellants.

*Messrs. Pickrel, Schaeffer & Ebeling, Mr. William L. Havemann* and *Mr. Gregory F. Singer,* for appellee PEG, Inc.

BROGAN, J. Neil Jenkins began experiencing chest pains around June 8, 1976. On Tuesday, June 22, 1976 his wife, Margaret, rescheduled a previously cancelled appointment for him to see their family physician, Dr. Willard Clark, that evening. However, Dr. Clark's vacation began on Wednesday and he wanted a report on Mr. Jenkins' condition before leaving the area. Therefore, Mr. Jenkins subsequently was directed to proceed instead to the Good Samaritan Hospital emergency room, where Dr. Clark had left instructions to have an EKG and chest x-rays taken.

The physicians on duty in the emergency room when Mr. Jenkins came in were Dr. Steven Yowell and Dr. Leroy Vickers. Dr. Yowell, a first-year postgraduate resident employed by the hospital, conducted the examination of Mr. Jenkins. Dr. Yowell possessed a temporary license from the State Board of Medical Examiners, which enabled him to practice under the supervision of a fully licensed physician within the confines of the hospital and its programs.

Dr. Vickers, who was a fully licensed physician, was in charge of the emergency room that evening pursuant to a contract between the hospital and a group of four physicians who had formed Physician's Emergency Group, Inc. ("PEG"). Pursuant to this contract, PEG agreed to supply the necessary physicians for the staffing of the emergency room as well as to assist

in the training of interns and residents rotating through the emergency room. Dr. Vickers, as an independent contractor, had made arrangements with PEG to act as the physician on duty in the emergency room at various times, including the evening of June 22, 1976.

Dr. Yowell conducted the examination of Mr. Jenkins. Initially, in taking the patient's history, Dr. Yowell neglected to discern that the patient had been experiencing chest pains for approximately two weeks. Therefore, Dr. Yowell was concerned only with the pain Mr. Jenkins had been experiencing the day of the examination. Upon completion of Mr. Jenkins' examination that evening, Dr. Yowell determined that some indication of abnormality in the chest could be seen in the x-rays but found no evidence in the EKG tracing that the pain Mr. Jenkins had been experiencing that day was a myocardial infarction. Dr. Yowell diagnosed Mr. Jenkins' condition as a nonspecific chest pain possibly due to pneumonia or a congested lung infection.

Apparently, Dr. Vickers did not participate in the examination except to the extent of a review of the chest x-ray. The Jenkins family did receive a bill for services rendered by PEG.

Dr. Yowell relayed his findings by phone to Dr. Clark who then directed that the patient could be released but instructed Mr. Jenkins to see Dr. Clark's associate, Dr. Robert Smith, for a follow-up examination.

On Wednesday, June 23, 1976, a hospital cardiologist reviewed the EKG tracing and a radiologist examined the chest x-rays. The interpretations given by these individuals differed significantly from those of Dr. Yowell. However, a timely comparison of the varying interpretations did not occur.

Dr. Smith examined Mr. Jenkins on Friday, June 25, 1976, allowing Mr. Jenkins to return to work, as a barber, after the appointment.

Around 1:00 a.m. on June 27, 1976,

Mr. Jenkins suffered a heart attack which took his life.

On June 6, 1977 Mrs. Jenkins, individually and as executrix, filed a complaint against Dr. Clark, Dr. Smith, Dr. Yowell, Dr. Vickers, Good Samaritan Hospital and PEG for negligently causing her husband's death. A copy of the complaint and a summons were sent to PEG by certified mail the same day.

On August 3, 1977, Mrs. Jenkins moved for a default judgment on the issue of liability against PEG for failure to plead or otherwise defend within the appropriate time. Civ. R. 12(A)(1). The court scheduled a hearing on this motion for September 13, 1977 and mailed a notice to PEG by ordinary mail.

However, on August 31, 1977 PEG filed a motion for leave to file an answer. The court then decided to hear arguments on the opposing motions in chambers on October 18, 1977.

At such meeting the court determined that it would not be necessary to take testimony or conduct a formal hearing. In the interests of justice and due to excusable neglect, the court granted the motion for leave to file an answer and denied the motion for default.

Subsequently, Mrs. Jenkins entered into a settlement agreement with all defendants except PEG. However, the settlement did serve to exculpate PEG from any vicarious liability for the acts of those other defendants.

The case proceeded to trial against PEG on May 19, 1980 premised, essentially, upon a theory of mismanagement. The jury returned a verdict for defendant on June 2, 1980.

Mrs. Jenkins filed a motion for a judgment notwithstanding the verdict and, alternatively, for a new trial which was overruled on January 13, 1981.

Mrs. Jenkins (hereinafter "appellant") timely filed a notice of appeal and has set forth seven assignments of error. The first such assignment states as follows:

"The trial court erred to the prejudice of the plaintiff-appellant granting the motion of the defendant for leave to file an answer and failing to take testimony or to conduct formal hearing."

Initially, appellant contends that sending a notice of the hearing on the motion for default to appellee violated Civ. R. 55(A).

That rule provides, in part, as follows:

"If the party against whom judgment by default is sought has appeared in the action, he (or, if appearing by representative, his representative) shall be served with written notice of the application for judgment at least seven days prior to the hearing on such application."

Where a party has not made an "appearance" in an action he is not *entitled* to notice of the default proceedings. *Sexton* v. *Sugar Creek Packing Co.* (1974), 37 Ohio St. 2d 58 [66 O.O.2d 121]. Clearly, however, Civ. R. 55(A) does not *prohibit* the mailing of notice to a party who has not appeared in the action.

Appellant's initial argument is unpersuasive. However, appellant also maintains that granting appellee's motion for leave to file an answer without conducting a hearing contravened the Rules of Civil Procedure as well as appellant's constitutional right to due process.

Civ. R. 6(B) establishes that:

"When by these rules or by a notice given thereunder or by order of court an act is required or allowed to be done at or within a specified time, the court for cause shown may at any time in its discretion * * * (2) upon motion made after the expiration of the specified period permit the act to be done where the failure to act was the result of *excusable neglect* * * *." (Emphasis added.)[1]

Clearly, a trial court has broad discretion in settling procedural matters. However, as evidenced by Civ. R. 6(B), such discretion is not unlimited. A sufficient showing of excusable neglect is a necessary prelude to the granting of a motion to file an answer made after the period of time provided in Civ. R. 12(A)(1) for filing such answer. *Miller* v. *Lint* (1980), 62 Ohio St. 2d 209 [16 O.O.3d 244] (the trial court erroneously permitted the defendant to file an untimely answer without first having filed a motion pursuant to Civ. R. 6[B][2]).

However, a hearing is not an absolute prerequisite to the granting of the motion where there is sufficient evidence of excusable neglect in the record. See *Doddridge* v. *Fitzpatrick* (1978), 53 Ohio St. 2d 9 (defendant, asserting excusable neglect, filed a motion to vacate a default judgment pursuant to Civ. R. 60[B][1]); see, also, *East Ohio Gas* v. *Walker* (1978), 59 Ohio App. 2d 216 [13 O.O.3d 234]; *Adomeit* v. *Baltimore* (1974), 39 Ohio App. 2d 97 [68 O.O.2d 251]; *Thatcher* v. *Omietanski* (Nov. 10, 1978), Montgomery App. No. CA 6694, unreported; *Don Kremer Lincoln-Mercury* v. *Robbins* (April 22, 1977), Montgomery App. No. CA 5489, unreported.

The record in the instant case indicates that the complaint and summons properly had been served upon PEG's statutory agent. The agent forwarded this material to Dr. Nicolo Mileti, one of appellee's four principal shareholders. Such action was error, according to an affidavit by the manager of Physician's Billing Service, Inc. (which performed various secretarial functions for appellee including receiving and answering mail). The affiant further stated that upon receipt, Dr. Mileti mistakenly thought the papers constituted merely an information copy. When the affiant learned of the

---

[1] Civ. R. 55 (A) establishes that:

"If, in order to enable the court to enter judgment or to carry it into effect, it is necessary * * * to establish the truth of any averment by evidence or to make an investigation of any other matter, the court may conduct such hearings * * * as it deems necessary and proper * * *."

mistake, she took the necessary steps to provide an answer.

Such information in the opinion of this court was not sufficiently indicative of excusable neglect to deprive appellant of her right to a hearing. Unquestionably, doubt, if any, should be resolved in favor of hearing the merits of a particular dispute. However, this principle does not obviate the requirement that a movant demonstrate that he is entitled to relief. *GTE Automatic Electric* v. *ARC Industries* (1976), 47 Ohio St. 2d 146, 151 [1 O.O.3d 86].

As noted in *Miller, supra,* at 215:

"However hurried a court may be in its efforts to reach the merits of a controversy, the integrity of procedural rules is dependent upon consistent enforcement because the only fair and reasonable alternative thereto is complete abandonment."

The trial court abused its discretion in declining to hold a hearing on the motion to file an answer. Appellant's first assignment of error is well-taken.

As her second assignment of error, appellant maintains that:

"The trial court committed error prejudicial to the plaintiff-appellant wherein during the course of the plaintiff's presentation of her evidence in chief, the trial court interrogated plaintiff's key medical witness reasonably indicating to the jury the court's opinion as to the credibility of the witness and the weight to be given to his testimony."

At trial appellant introduced evidence that appellee's officers and employees had no knowledge of several hospital policies and procedures relating to the quality of care to be rendered in the emergency room. Thereafter, appellant presented the testimony of Dr. Richard Levy, Chairman of the University of Cincinnati Medical School's Emergency Services. The crux of Dr. Levy's testimony concerned appellee's deviations from accepted standards of medical management, which, assertedly, proximately contributed to decedent's death.

One of the written hospital policies at issue concerned the availability of cardiologists and radiologists for the reading and interpretation of EKG tracings and x-rays after regular hours when needed. In response to questions by appellant regarding this policy, Dr. Levy indicated that confusion often existed among trainees about the availability of such specialists unless the trainees had been made aware of the policy.

At that point the following dialogue occurred:

"THE COURT: May I ask Doctor, if someone who goes to medical school, and studies about the heart, and studies about x-rays, and so forth, and now he is an intern, if he sees something, isn't he going to, without this rule, ask for some opinion? Isn't this within the common knowledge after so many years of training for an intern to do this without the necessity of a rule?

"A. No. Not necessarily at all. That depends very much on where a person has gone to medical school, and what the practice might be there.

"THE COURT: Outside of doctors, and laymen, who reads a report, who is over 21 years of age, that has gone to school and college, when a layman reads a report and doesn't understand it, what would the layman do?

"A. Depends on the —

"THE COURT: —So in other words the medical student who's gone through college and medical school, and so forth, would have normally no more, would make no attempts to go further when he sees something he doesn't understand than the layman, a doctor wouldn't have any more knowledge in that respect?

"A. No. I don't think that's the case at all.

"THE COURT: That's what I was asking.

"A. All right. The medical student would have, hopefully, more knowledge on a particular subject than a layman if it's in regard to medicine, and I would

hope that if they had some unanswered questions that they would seek answers. The problem is that not always do they do that, and especially if they're in an environment where they don't know the policies and procedures they sometimes fall back on, well, I think it's this, so I'll go with it. If they knew the procedure they might do something different.

"THE COURT: Okay."

Appellant contends that although the inflection of his voice is not apparent from the record, the form of the trial court's questions alone clearly reveals the court's intention to attack the credibility of appellant's key witness.

The doctor's testimony, appellant maintains, was essential to her claim of administrative mismanagement and non-management contributing to Mr. Jenkins' death. Appellant argues that the court's questioning clearly was of a devastating character in that it caused the jury to give undue weight to the position that interns and residents would ask for assistance if a problem developed regardless of their knowledge of the existence of this hospital policy.

Appellant also asserts that workable alternatives were open and available to the trial court if he was of the opinion that the testimony was not credible. For example, the court easily could have expressed his concern to appellee's counsel at a bench conference beyond the hearing of the jury so as to ensure appropriate cross-examination.

Appellee on the other hand argues the exchange between Dr. Levy and the court reveals an objective intention on the part of the trial court to clarify Dr. Levy's testimony concerning the circumstances under which an intern might seek an additional medical opinion. The court's inquiry, appellee insists, was clearly calculated to determine the relevancy of the general question of a resident seeking a consultation with or without an emergency "rule." Appellee submits that it was the court's proper function to inquire whether a resident may be expected to seek consultation on his own in order to determine whether the testimony concerning a rule instructing the intern to do so was material.

In regard to the examination of witnesses, the trial judge is something more than a mere umpire or sergeant at arms to preserve order in the courtroom. He has active duties to perform in maintaining justice and in seeing that the truth is developed and may for such purpose put proper questions to the witnesses, and even leading questions. *Gilhooley* v. *Columbus Ry. Power & L. Co.* (1918), 20 Ohio N.P. (N.S.) 545. If at any time during the trial of a cause a judge is prompted, in the interest of justice, to develop facts germane to an issue of fact to be determined by the jury, it is proper that he do so. *Dependabilt Homes, Inc.* v. *Haettel* (1947), 81 Ohio App. 422 [8 O.O.2d 198].

Although there may be a difference of opinion and taste as to how much a judge should ask questions from the bench, he may, according to the generally accepted view, in his discretion, propound to witnesses, proper and pertinent questions which are designed to develop the true character of the transaction in question, which counsel have failed to propound, and thus elicit testimony more fully revealing the true facts in the case. *Gilhooley, supra.* In fact, there should be no hesitancy on the part of the trial court, in the interest of justice, in examining a witness so as to clarify and bring out in an understandable way the material facts in issue, using proper discretion and being particularly careful not to overemphasize one side of the case. *Smith* v. *Milhoff* (App. 1935), 20 Ohio Law Abs. 537.

To this end the trial court may ask leading questions where counsel cannot do so although, of course, the court should avoid asking a question in such a leading form as to indicate to the jury the mind of the court on a controverted fact. *Gilhooley, supra.* He must use great care not to assume the role of an advocate and

should not conduct himself so as to give the jury any impression of his feelings *State, ex rel. Wise,* v. *Chand* (1970), 21 Ohio St. 2d 113 [50 O.O.2d 322]. The third and fourth paragraphs of the syllabus in *Chand* are instructive, to wit:

"3. In a trial before a jury, the court's participation by questioning or comment must be scrupulously limited, lest the court, consciously or unconsciously, indicate to the jury its opinion on the evidence or on the credibility of a witness.

"4. In a jury trial, where the intensity, tenor, range and persistence of the court's interrogation of a witness can reasonably indicate to the jury the court's opinion as to the credibility of the witness or the weight to be given to his testimony, the interrogation is prejudicially erroneous."

In the absence of any showing of bias, prejudice, or prodding of a witness to elicit partisan testimony, it will be presumed that the court acted with impartiality in attempting to ascertain a material fact or to develop the truth. *Gilhooley, supra.*

The questioning by the court *sub judice* appears to be an obvious question to ask: Would an intern by virtue of his medical training naturally look for assistance in case of doubt in light of his inexperience? The witness answered that an intern would seek assistance depending on the practices he learned in his medical school. He further answered he might not seek assistance if he was unfamiliar with the policies and procedures of the hospital (which indeed was the theory espoused by the appellant herein). We find that the questioning by the court was terse and to the point and did not indicate any particular bias or prejudice on behalf of the court. Indeed the court appeared satisfied with the explanation of the witness with the court's reply: "Okay."

Further, the record reveals that counsel for appellant failed to object to the questioning by the trial court at that time or at anytime thereafter out of the hearing of the jury.

Remarks by the court will not be held to be prejudicial error where no objection was interposed by the defense to the court's remarks, thus depriving the court of any opportunity to correct the alleged error. *Matthew* v. *New York Central R.R. Co.* (App. 1960), 18 O.O.2d 409.

Additionally, in the matter herein the court at the very beginning of its final instructions admonished the jury to ignore any factual bent attributable to the court. This instruction would cure any inference the jury may have received by the court's brief inquiry of Dr. Levy. See *State* v. *Williams* (1975), 43 Ohio St. 2d 88, 94-95 [72 O.O.2d 49].

The second assignment of error is not well-taken.

Appellant's third assignment of error states:

"The trial court erred in the conduct of the trial below to the prejudice of the plaintiff-appellant requiring the plaintiff to read depositions at trial in their entirety as part of plaintiff's case rather than as provided by Civil Rule 32 permitting the plaintiff to present the relevant portions."

Civ. R. 32(A) provides in part as follows:

"At the trial * * *, any part or all of a deposition, so far as admissible under the rules of evidence applied as though the witnesses were then present and testifying, may be used against any party who was present or represented at the taking of the deposition or who had reasonable notice thereof, in accordance with any one of the following provisions:

"* * *

"(4) If only part of a deposition is offered in evidence by a party, an adverse party may require him to introduce all of it which is relevant to the part introduced, and any party may introduce any other parts. * * *"

Six months prior to the commencement of trial, appellant had filed with the

court and served upon opposing counsel, notice of those parts of depositions which were to be read as part of her case, identified by page and line reference.

However, at trial the court adopted a ruling that appellant would be required to read the depositions in their entirety except those portions to which an appropriate objection was sustained. Upon commencement of the reading of the first deposition, that of Dr. Vickers, appellant noted her objection to this procedure as follows:

"MR. HUBER: Let the record show the plaintiff filed notice with the Court pursuant to Civil Rules indicating those portions of the depositions plaintiff chose to read at trial, and made motion to the Court for leave to follow through to read those portions as part of her case as designated in the pretrial disclosure statement, and the Court's ruling to the effect that the entire deposition without deletions should be read at this time, and we incorporate by virtue of this motion and this notice that request was made and denied, and that the full, complete depositions of each of the witnesses are being read under that objection by the plaintiff."

The Staff Note to Rule 32 provides in pertinent part as follows:

"Rule 32(A)(4) restates the classic evidentiary rule that if part of a paper or document is introduced into evidence, the opposing party may *require* production of any other relevant portions *or the whole paper* or document." (Emphasis added.)

In the instant case, following appellant's objection, counsel for appellee stated as follows:

"MR. BARNHART: I stand on the objections — you have to make it at the time. I think the record should probably show that the defendant would read the entire deposition of Dr. Vickers, and it's better to read it now in its entirety than to delay —."

Thus, it is clear that appellee exercised its right to require the entire depositions be introduced into evidence. Rule 32(A)(4) does not leave the trial court a great deal of discretion in this regard, regardless of appellee's purpose in so requiring the complete deposition to be read. Appellant's recourse would be appropriate objections as to relevancy or other objections as contemplated by Civ. R. 32(B).

The trial court did not summarily overrule any objections as to relevancy before the depositions were read to the jury:

"THE COURT: That isn't to say if someone objects to a question, and if it's improper that I would sustain a motion at that particular time as it goes along.

"MR. HUBER: But I do understand an objection would have had to be made at the taking of this for an objection to be lodged at this time?

"THE COURT: Well, no * * *."

The trial court's ruling was consistent with Civ. R. 32(B) which provides, "objection may be made at the *trial* or hearing to receiving in evidence any deposition or part thereof for any reason which would require the exclusion of the evidence if the witness were then present and testifying." (Emphasis added.)

Appellant contends that she did not offer the deposition testimony of Drs. Clark, Smith, Weinberg and Brecount, rather than read their entire depositions and risk boredom and inattention on the part of the jury. While appellee desired all of the depositions to be read in their entirety, appellant could have objected to those portions she believed were irrelevant and the court could have ruled upon them as the trial progressed.

We find no error in the court's requiring the depositions to be read in their entirety subject to appropriate timely objections as to relevancy. The third assignment of error is overruled.

As her fourth assignment of error, appellant contends:

"The trial court erred to the prejudice of the plaintiff-appellant in refusing to incorporate within the general charge the

instruction on the law as requested by the plaintiff and submitted in writing to the court concerning the objective standard of care by which the conduct of the defendant P.E.G., Inc. was to be evaluated by the jury."

Appellant requested that the court include within the general charge an instruction in the following form:

"You are further instructed that the duty of care owed to a patient does not vary according to the attending doctor's individual knowledge or education, but instead P.E.G., Inc. was under duty to furnish and provide that quality of care usually found in a medical community."

Instead, the court utilized the following instruction:

"A physician or in this case the defendant P.E.G., Inc. is negligent if he, or in this case the legal entity, P.E.G., Inc. fails to use for the treatment of its patients that degree of knowledge, skill and care ordinarily used by reasonably careful physicians or hospital emergency room operators *under the same or similar conditions and circumstances."* (Emphasis added.)

The charge given by the trial court is the standard charge approved by the Ohio Judicial Conference and published in its Ohio Jury Instructions, Section 331.01 (b) (OJI Civil Issues).

Initially, appellant sought to have appellee found primarily liable for failing to properly manage its emergency room service and that said mismanagement proximately caused the death of the appellant's decedent. Appellant attempted to demonstrate that appellee had violated its contract with Good Samaritan Hospital by improperly staffing the emergency room with inadequate physician coverage "during peak hours" and to properly acquaint its employees with the policies and responsibilities contained in its contract with the hospital. Appellee assertedly was jointly responsible for the death of Mr. Jenkins, which liability was primary and not vicarious.

Appellant contends that while the contract between appellee and the hospital permitted use of interns or residents, appellee had a duty to properly train, manage, and supervise their handling of emergency treatment and care at the hospital. Appellant maintains that the fact Dr. Yowell was relatively inexperienced as a physician created no excuse or safety valve for appellee but indeed made it even more imperative that appellee properly monitor and manage Dr. Yowell's professional conduct at the hospital.

Appellant was concerned that the jury would find that no negligence was involved in the treatment of Mr. Jenkins if they believed residents were not expected to competently read an EKG or examine x-rays for evidence of cardiac problems.

It is clear that the standard of care required of the physician is not an individualized one but one of physicians in general in the community. *McBride* v. *United States* (C.A. 9, 1972), 462 F. 2d 72; *Bruni* v. *Tatsumi* (1976), 46 Ohio St. 2d 127 [75 O.O.2d 184]. In order to establish medical malpractice, it must be shown by a preponderance of the evidence that a physician did some particular thing or things that a physician or surgeon of ordinary skill, care and diligence would not have done under like or similar conditions or circumstances, or that he failed or omitted to do some particular thing or things that a physician or surgeon of ordinary skill, care and diligence would have done under like or similar conditions or circumstances, and that the inquiry complained of was the direct result of such doing or failing to do such thing or things. *Ault* v. *Hall* (1928), 119 Ohio St. 422.

Even before the adoption of the Civil Rules, the court had discretion as to the language of its instruction and was not bound by the requested language of counsel. *W.J. Gawne Co.* v. *Fry* (1906), 7 Ohio C.C. (N.S.) 317. The substance of the charge is the only relevant matter. *Behm* v. *Cincinnati, D & T Traction Co.* (1912),

86 Ohio St. 209. The duty to give sound legal instructions is an imperative one. *Electric RR. Co.* v. *Hawkins* (1901), 64 Ohio St. 391.

We note that the standard instruction given by the court was indeed a proper one. It clearly informed the jury that the medical care required is that of reasonably careful physicians or hospital emergency room operators, not that of interns or residents. Concededly, the instruction submitted by appellant would have more clearly delineated that standard of care. Nevertheless, we do not feel the trial court abused its discretion in limiting the instructions to the standard one suggested in OJI or envisaged in *Bruni* v. *Tatsumi, supra.*

The fourth assignment of error is not well-taken.

Appellant's fifth assignment of error is as follows:

"The trial court erred to the prejudice of the plaintiff-appellant, refusing to instruct the jury on plaintiff's claim for relief founded upon a theory of fraud and deceit * * *."

Pertinent to the present case, the basic elements of a claim of fraud are:

1) knowledge of a material fact;

2) concealment of that fact;

3) intent to mislead another into relying upon the conduct to which such fact is applicable;

4) actual reliance by such other person, having a right to so rely; and

5) injury resulting from such reliance.

See *Crum* v. *McCoy* (1974), 41 Ohio Misc. 34 [70 O.O.2d 76]; 24 Ohio Jurisprudence 2d, Fraud and Deceit, Sections 20 *et seq.*

Further, the mere failure to disclose a fact is not equivalent to concealment, which implies a purpose or design. *Klott* v. *Associates Real Estate* (1974), 41 Ohio App. 2d 118 [70 O.O.2d 129]. However, nondisclosure by a person who, under the circumstances, has a duty to speak may be commensurate with concealment. See 24

Ohio Jurisprudence 2d, Fraud and Deceit, Sections 77-89.

In addition, the intention to mislead may be inferred and in some cases presumed depending upon the circumstances giving rise to the claim. 24 Ohio Jurisprudence 2d, Fraud and Deceit, Section 113.

In the present case, clearly no fraud in the inducement existed in that decedent appeared at the emergency room on his family physician's instructions. However, appellant maintains that appellee committed fraud in failing to reveal to decedent the following facts:

1) that Dr. Yowell was only a resident, without full licensure by the state;

2) that Dr. Yowell's interpretations of the EKG tracings and chest x-rays would not be compared with the interpretations by the hospital's cardiologist and radiologist;

3) that no general chart review of Dr. Yowell's findings would be made by a fully licensed supervising physician; and

4) that appellee knowingly was violating its contract with the hospital by failing to provide double coverage in the emergency room during peak work hours.

This failure allegedly caused decedent to rely to his detriment upon the expertise of Dr. Yowell in the diagnosis of decedent's condition.

Initially, having thoroughly reviewed the record we have determined that, *inter alia,* the evidence did not sufficiently establish a foundation upon which an inference of intent to mislead could have been based. This court is inclined to agree with the trial court's determination that based upon the facts and circumstances of this case a claim of fraud would be far-reaching and an instruction thereon unwarranted.

Further, having determined herein that the jury reasonably could conclude that appellee's conduct did not proximately cause decedent's death, thereby, negating any claim for compensatory damages, an award of punitive damages,

upon which appellant's claim of fraud is based, is improper. See *Argrov Box Co.* v. *Illini Four Co.* (June 15, 1981), Montgomery App. No. CA 6947, unreported. Therefore, any error by the court in failing to instruct the jury on the issue of fraud was harmless.

Appellant's fifth assignment of error is not well-taken.

As her sixth assignment of error appellant maintains that:

"The trial court erred to the prejudice of the plaintiff-appellant in overruling the plaintiff's motion for judgment notwithstanding the verdict."

Civ. R. 50 (B) prohibits a trial court from rendering a judgment on the ground that the verdict is against the weight of the evidence. However, appellant argues that she presented sufficient uncontradicted evidence of appellee's liability to warrant a judgment notwithstanding the verdict.

The evidence uncontrovertibly established that appellee had been responsible for supervision of the emergency room. Further, assertedly, appellee had failed to comply with applicable standards of the Joint Committee on Accreditation of Hospitals. In addition, appellant argues that the evidence clearly established that the physicians present in the emergency room had no knowledge of the existence of pertinent established written hospital policies and such lack of knowledge was due to the lack of knowledge of these policies by appellee.

However, it does not appear that the evidence uncontrovertibly established that any errors or omissions which appellee may have committed constituted an independent and proximate cause of decedent's death. The jury reasonably could have concluded that appellee's liability in this matter was vicarious in nature, not independent. Mere disagreement with the jury is not a sufficient basis upon which to grant a judgment notwithstanding the verdict. The trial court's decision denying

appellant's motion for such judgment will not be disturbed.

Appellant's sixth assignment of error is not well-taken.

Appellant's seventh assignment of error states:

"The trial court erred to the prejudice of plaintiff-appellant in denying the * * * motion for new trial * * *."

Appellant's motion before the trial court was based upon Civ. R. 59 (A)(1), (6), (7) and (9) which provide as follows:

"A new trial may be granted to all or any of the parties and on all or part of the issues upon any of the following grounds:

"(1) Irregularity in the proceedings of the court * * * or any order of the court * * * by which an aggrieved party was prevented from having a fair trial;

"* * *

"(6) The judgment is not sustained by the weight of the evidence; * * *

"(7) The judgment is contrary to law;

"* * *

"(9) Error of law occurring at the trial and brought to the attention of the trial court by the party making the application."

Appellant contends that the irregularities in the proceedings consisted of the ruling requiring the reading of entire depositions as well as the failure of the court to instruct the jury on the issue of fraud.

These problems have been addressed in Assignments of Error Nos. 3 and 5, respectively, and have been found not to require a reversal of the verdict for appellee. Similarly, such asserted errors do not mandate a reversal of the trial court's decision on the motion for a new trial.

Regarding the weight of the evidence, appellant asserts that appellee violated the provision in its contract with the hospital which required double coverage during peak work load hours (as determined by agreement of the parties to the contract). Appellant insists that these peak hours were admitted by several of

appellee's officers to be during the evening shift every night of the week.

However, other credible evidence from another of appellee's officers indicated that the peak hours occurred during the evening shifts on Wednesday, Friday, Saturday and Sunday.

Having reviewed the relevant testimony, it does not appear that the evidence in appellant's favor was so overwhelming as to cause any finding to the contrary to be improper. The court properly could have declined to reverse a jury decision that appellee was not required to provide double coverage on Tuesday evenings.

More importantly, assuming the jury did find that appellee violated its contract with the hospital, it does not necessarily follow that the failure to provide double coverage on the night of decedent's examination was a proximate cause of his death. While we might disagree with the jury's decision, the evidence was not so inadequate as to require the trial court to grant appellant a new trial in this matter.

Further, the judgment does not appear to be contrary to law nor have we found that any errors brought to the attention of the trial court required the court to grant appellant's motion for a new trial.

Appellant's seventh assignment of error is not well-taken.

The judgment of the trial court is reversed and the cause is remanded for a hearing on the motions for leave to file an answer and for a default judgment. The judgment of the trial court is affirmed in all other respects and the remand is for purposes of deciding the question of whether a default judgment should be entered after a hearing on excusable neglect of the defendant is conducted.

*Judgment accordingly.*

KERNS, P.J., concurs.

WILSON, J., dissents.

KERNS, P.J., concurring. I concur in the judgment of reversal, but hasten to add that the reversal does not *necessarily* contemplate any disturbance of the conclusion reached by the trial court in its judgment entry of August 11, 1980. After a hearing is held to determine whether "excusable neglect" for failing to plead did, in fact, exist, the trial court may enter a new judgment reaffirming its former judgment and permitting the appellant to supplement the record with the evidence presented at the hearing; in the alternative, it may find no evidence of excusable neglect and grant the default judgment. However, in no event does the reversal of the judgment contemplate another jury trial on the merits. Authority for this type of limited reversal may be found in *State* v. *White* (1968), 15 Ohio St. 2d 146 [44 O.O.2d 132]. See, also, *State* v. *Goode* (April 24, 1979), Greene App. No. CA 1025, unreported.

In other words, the final determination must await a remand to the court of common pleas for a hearing to determine whether the granting of leave to file an answer contravened the Civil Rules and/or otherwise constituted an abuse of discretion as that term is defined in law.

WILSON, J., dissenting. I do not agree that the trial court abused its discretion in declining to hold a hearing on the motion to file an answer. An exercise of discretion by a trial court may be erroneous but still valid.

The exercise of discretion should be considered in the light of the strong public policy favoring trials on the merits instead of defaults. I would affirm.