[Cite as *State v. Brown*, 2013-Ohio-1579.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

STATE OF OHIO                           :
                                        :       Appellate Case No. 25285
          Plaintiff-Appellee            :
                                        :       Trial Court Case No. 2011-CR-4307
v.                                      :
                                        :
THOMAS L. BROWN                         :       (Criminal Appeal from
                                        :        Common Pleas Court)
          Defendant-Appellant           :
                                        :

. . . . . . . . . . .

O P I N I O N

Rendered on the 19th day of April, 2013.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by MICHELE D. PHIPPS, Atty. Reg. #0069829, Montgomery
County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, P.O. Box
972, 301 West Third Street, Dayton, Ohio 45422
          Attorney for Plaintiff-Appellee

GARY C. SCHAENGOLD, Atty. Reg. #0007144, 4 East Schantz Avenue, Dayton, Ohio 45409
          Attorney for Defendant-Appellant

. . . . . . . . . . . .

FAIN, P.J.

{¶ 1}     Defendant-appellant Thomas Brown appeals from his conviction, in a trial to

the bench, for Non-Support of a Dependent.  Brown contends that the trial court improperly

interrogated him while he was testifying in his defense. He further contends that trial counsel was ineffective for failing to object to the trial court's interrogation. Finally, Brown contends that his conviction is against the manifest weight of the evidence.

{¶ 2} We conclude that the trial court, in its questioning, crossed the line from neutral interrogation to partisan cross-examination of Brown on the issue of his ability to pay support. A trial court's bias – i.e., failure to remain neutral and impartial – is a structural defect in the trial itself, which may not be deemed harmless. *Arizona v. Fulminante*, 499 U.S. 279, 309-310, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). The requirement of a contemporaneous objection does not apply to partisan questioning by a trial court acting as a finder of fact, since: (1) defense counsel is deterred from interposing an objection based upon a claim that the trial court, as finder of fact, is biased; and (2) the structural error – the failure of the trial court to remain impartial – is already complete, and the nature of that error is one that the trial court cannot reasonably be expected to remedy.

{¶ 3} Because Brown was deprived of a trial to a neutral and impartial finder of fact, his conviction is Reversed, and this cause is Remanded for a new trial.

## I. The Course of Proceedings

{¶ 4} Brown was indicted on one count of Non-Support of Dependents in violation of R.C. 2919.21(B). After waiving a jury trial, the case proceeded to a bench trial in May and June of 2012. At the start of the trial, Brown stipulated to the offense, but asserted the affirmative defense of inability to pay.

{¶ 5} The State did not present any witnesses, but rested upon Brown's stipulation.

Brown testified concerning his inability to pay support. The State did not present a case in rebuttal.

{¶ 6} Brown was convicted as charged, and sentenced to community control. From his conviction and sentence, Brown appeals.

## II. Brown's Defense of Inability to Pay

{¶ 7} Brown testified on his own behalf. He testified that he had obtained his GED, and was enrolled in college courses for about one and a half years. He currently lives in a house he owns in rural Rose Hill, Virginia. He lives with his wife, and his mother lives next door.

{¶ 8} Brown testified that since 1998 he has worked at various jobs, including bouncer, bartender, disc jockey, and satellite and cable installation. He testified that he currently sells items including "body jewelry," incense, and knives, and also sharpens knives, at swap meets, flea markets, bike rallies, and horse sales. He also sells firewood. He stated that both the flea market and firewood jobs are seasonal. Brown testified that his wife is unemployed due to disability.

{¶ 9} Brown presented the classified ads from his home town newspaper dated May 26, 2012. He testified that only five jobs were listed in the classified ads, and that he was not qualified for two of those. He testified that he lives twenty miles from the closest Wal-Mart, and that any fast-food restaurants are equally far away. He testified that there are no other retail stores, and that the mining jobs have shut down. He further testified that he relies on the "free clinic" for his medical needs, and that he and his wife are currently receiving food stamps. He testified that he cares for his mother, who has stage four terminal cancer, and that he takes her to

her medical and legal appointments. He testified that his failure to pay child support is the result of limited, inconsistent income, which he has to divide between household expenses, child support in this case, and child support owed for a child in a separate case in Virginia. He testified that he pays his support obligations to the best of his ability.

{¶ 10} On cross-examination, Brown testified that when he goes to fast-food restaurants, he is told that he is overqualified. But he admitted that he had not submitted any job applications to any of those restaurants. He testified that he had submitted ten job applications since he was released from a diversion program, and that he has been looking for employment in his trade field of cable and satellite installation.

{¶ 11} Brown admitted that he smokes one and a half packs of cigarettes per day, and that he owns a cellular telephone, for which he regularly pays the bill. He testified that he does not have cable. He testified that he has physical problems with his back and knees that prevent him from climbing telephone poles, and that he stopped those activities in 2003. But he admitted that he filled out a form for the diversion program in 2007, in which he indicated that he does not have any physical disabilities, and that his general health is "okay." Finally, Brown testified that he is current on his child support obligations in Virginia, but that he does owe an arrearage on that support.

### III. The Trial Court's Interrogation

{¶ 12} After cross-examination was complete, the trial court began to question Brown. After the trial court inquired as to the location of Brown's residence – Rose Hill, Virginia – Brown testified that the town is located "in the very tip of Virginia between Kentucky and

Tennessee." The trial court began a computer search of the locale from the bench, and the following colloquy then took place between the court and Brown:

THE COURT: So it looks like Rose Hill, Virginia is right off the – right off the Daniel Boone Trail – what this tells me, right off 58.

THE WITNESS: Yes

THE COURT: And it looks like it sits very close to Cumberland Gap National Park.

THE WITNESS: Yes, ma'am.

THE COURT: Have you ever applied for a job there?

THE WITNESS: No, I haven't. I spoke to them about selling them firewood.

THE COURT: Well, that's not what I asked you. Did you ever apply for a job there?

THE WITNESS: No.

THE COURT: It looks like there's also another national – or a state park. Can't tell the distance. Kantonia (phonetic) State Park. Did you ever apply for a job there?

THE WITNESS: No, I didn't.

THE COURT: There's an airport – Tucker-Guthrie Memorial Airport. Did you ever apply for a job there?

THE WITNESS: No, ma'am.

THE COURT: There's another one – Pine Mountain State Park. Ever

apply for a job there?

THE WITNESS:   No, that's over in Kentucky.

THE COURT:   Yeah, well, you can't cross the state line?

THE WITNESS:   Yes, I can.   Most of that is done by forestry agents that have been there for –

THE COURT:   Okay, sir –

THE WITNESS:   – several years.

THE COURT:   I understand that's how you feel.   But have you ever applied for a job there?

THE WITNESS:   No, ma'am.

THE COURT:   What's the nearest big – the biggest city close –

THE WITNESS:   Knoxville –

THE COURT:   – by?

THE WITNESS:   – Tennessee –

THE COURT:   How far –

THE WITNESS:   – which is 80 or 90 miles away, depending – and Kings Ford, Tennessee, which is another 70 or 80 miles in that – the other direction.

THE COURT:   How big – how far is Big Stone Gap from where you live?

THE WITNESS:   About 50 miles.

THE COURT:   Ever applied for a job there?

THE WITNESS:   No, I don't get up there very often.

THE COURT:   I didn't ask you that.   Have you applied for a job there?

THE WITNESS:   No, ma'am.

THE COURT:   Have you ever considered moving so that you could find a job to pay your child support?

THE WITNESS:   Yes, I have.

THE COURT:   And you've not done that.   You're not moved –

THE WITNESS:   I have looked in Knoxville, and due to the – with the satellite and the cable, I cannot get a job in my trade because of the fact of being that there is felonies – indictments on my record.   I have looked online, and whenever I go on and I've spoken to them, even though they were dismissed, they are there and they will not even let me submit an application.

THE COURT:   And that's because of your behavior you've had these felony indictments; is that right?   These are your felony indictments, right?

THE WITNESS:   Yes.

THE COURT:   Have you ever been convicted of a felony?

THE WITNESS:   No.

THE COURT:   Are all these felony indictments that you're talking about for child support?

THE WITNESS:   Yes.   There's six of them.

THE COURT:   So you've previously been charged with failure to support children six times?

THE WITNESS:   No, they're – it was all at one time.

THE COURT:   Is that what – is that when you were on –

THE WITNESS:   The diversion.

THE COURT:   – the diversion –

THE WITNESS:   Yes.

THE COURT:   – previously?   And it sounds to me like you paid enough money to get off diversion.   As soon as you got off diversion, you stopped making your payments because you got indicted for the period of time right after that; is that fair?

THE WITNESS:   No, because there was payments made during that time.

THE COURT:   Is there something that limits you to working in the cable industry?

THE WITNESS:   Yes.

THE COURT:   What?

THE WITNESS:   With those felonies –

THE COURT:   I didn't ask you that.   Why can't you look at any other industry?   What prevents you from going somewhere else and doing something else?

THE WITNESS:   I don't know.   On that, I don't – I don't know whether I get the same reaction out of them or not.

THE COURT:   Have you ever sought the services of a job program to assist you in finding employment, particularly between July 22nd, 2010 and September 14th, 2011.   During that time period, did you do anything to seek the assistance of a job program, whether it's a state, local, or national – nationally

funded job program?

THE WITNESS:   Don't believe so.

THE COURT:   How far are these – you said you go to horse shows, flea markets.   What's the furthest one that you go?

THE WITNESS:   About 200 miles from my house.

THE COURT:   You go – and where do you stay when you got there?

THE WITNESS:   In the trailer in which I pull in my product.

THE COURT:   You said that there is a Wal-Mart how far from your house, 20 miles?

THE WITNESS:   Yes, ma'am.

THE COURT:   You ever applied for work there?

THE WITNESS:   No, I haven't.

THE COURT:   What about any grocery store?   You ever applied for work at a – during this time period, July 22nd, 2010 –

THE WITNESS:   No, I did not –

THE COURT:   – September 14th, 2011, did you ever apply at a grocery store?

THE WITNESS:   No.

THE COURT:   Did you ever apply at any – at – so you said you've submitted ten job applications during that time period?   Is that what –

THE WITNESS:   I –

THE COURT:   – you said?

THE WITNESS: I was submitting job applications in my trade, which was the satellite and the cable.

THE COURT: And you have not gone outside of your trade to seek employment; is that right?

THE WITNESS: No. I've been doing the best I could with the wood and the flea markets and doing that.

THE COURT: Who owns the house you live in?

THE WITNESS: I do now.

THE COURT: You own it. Okay. When did you become the owner?

THE WITNESS: Last Thursday.

THE COURT: How did that happen?

THE WITNESS: My mother is making her final arrangements.

THE COURT: So that house was owned by your mother until last week and I assume that your mother was letting you live there.

THE WITNESS: No. I do work for her and around the place on the upkeep on the house. It was –

THE COURT: You were paying –

THE WITNESS: – a family home place.

THE COURT: You weren't paying any rent, right?

THE WITNESS: No.

THE COURT: Is that true? You weren't paying any rent?

THE WITNESS: Correct.

THE COURT:   You are not legally obligated to support your mother and take care of her; is that correct?   You're not a court appointed guardian or anything like that?

THE WITNESS:   No, I'm not.   But I am her oldest son and that is an obligation.

THE COURT:   Sir, that's not what I asked you.   You don't have any legal obligation to support her.   You don't have a court order that says you have to provide for her care, do you?

THE WITNESS:   No, I don't.

THE COURT:   You have any tattoos?

THE WITNESS:   Yes, I do.

THE COURT:   When was the last time you had a tattoo?

THE WITNESS:   Years ago.

THE COURT:   You – do you do tattoo work?

THE WITNESS:   No, ma'am.

THE COURT:   I don't have anything else.

{¶ 13}   Thereafter, counsel for Brown was permitted to examine him on re-direct regarding any questions raised by the trial court's questioning.


### IV.   The Trial Court, in its Interrogation, Became Partisan

{¶ 14}   Brown asserts the following as his First Assignment of Error:

THE TRIAL COURT ERRED BY FAILING TO INTERROGATE A

WITNESS IN AN IMPARTIAL MANNER AS REQUIRED BY RULE 614(B)

OF THE OHIO RULES OF EVIDENCE.

**{¶ 15}** Brown contends that the trial court exceeded the permissible scope of Evid.R. 614(B) when proceeding to ask questions of him while he was on the witness stand.

**{¶ 16}** "Evid.R. 614(B) permits a trial judge to interrogate a witness as long as the questions are relevant and do not suggest a bias for one side or the other." *State v. Blankenship,* 102 Ohio App.3d 534, 548, 657 N.E.2d 559 (12th Dist.1995). The rule allows a trial judge to question witnesses, whether those witnesses are called by one of the parties, or by the court itself. Absent "any showing of bias, prejudice, or prodding of a witness to elicit partisan testimony, it will be presumed that the trial court acted with impartiality [in propounding to the witness questions from the bench] in attempting to ascertain a material fact or to develop the truth." *State v. Baston,* 85 Ohio St.3d 418, 426, 709 N.E.2d 128 (1999), quoting *Jenkins v. Clark,* 7 Ohio App.3d 93, 98, 454 N.E.2d 541 (2d Dist.1982).

**{¶ 17}** Judge Learned Hand expressed the proper role of a trial judge as an interrogator of witnesses in *U.S. v. Marzano*, 149 F.2d 923 (2d Cir.1945). Although *Marzano* involved a jury trial, the holding is relevant:

The situation appears to us to be one in which, as in *Quercia v. United States*, * * * 289 U.S. 466, 471, 53 S.Ct. 698, 700, 77 L.Ed. 1321, the judge 'did not analyze the evidence; he added to it'; and while it may be true that he did not base any 'instruction upon his own addition,' the effect was the same as though he had. Moreover, even if the jury were not as likely as seems to us to be the case, to have so understood what took place, *the judge was exhibiting a prosecutor's*

*zeal, inconsistent with that detachment and aloofness which courts have again and again demanded, particularly in criminal trials. Despite every allowance he must not take on the role of a partisan; he must not enter the lists;* he must not by his ardor induce the jury to join in a hue and cry against the accused. *Prosecution and judgment are two quite separate functions in the administration of justice; they must not merge. Id.* at 926 (Emphasis added.)

{¶ 18} We conclude that, unlike *State v. Baston, supra,* the trial court's questioning in the case before us did involve the "prodding of a witness to elicit partisan testimony." *Baston*, at 426. In *Baston*, "[t]he questioning * * * was limited, and consisted mostly of attempts to clarify the witnesses' testimony, as is contemplated by [Evid.R. 614(B)]." *Id.* In the case before us, the trial court's interrogation lasted seven and a half minutes,[1] and took up eight pages of transcript, as compared to eleven pages for the State's cross-examination.

{¶ 19} More importantly, the trial court crossed the line into partisanship at several points, "entering the lists," in Judge Hand's phrase.

{¶ 20} The trial court began by consulting the internet, during her interrogation, in order to ask Brown whether he had applied for jobs at national and state parks not far from his home. We note in passing that juries are not permitted to consult the internet when they are acting as finders of fact; whether the trial court in this case acted improperly in consulting the internet for what appears to have been the purpose of establishing a geographical foundation for its questions, only, is not a question that we are called upon to resolve in the case before us.

---

[1] We have listened to the audiovisual recording of this portion of the trial.

{¶ 21} Toward the end of the trial court's having established, through its questioning, that Brown had not applied for a job at any of the national or state parks in his general area, the trial court asked him if he had ever applied for a job at Big Stone Gap, about 50 miles from where he lived. Brown responded: "No, I don't get up there very often." Not content with his negative answer, the trial court said: "I didn't ask you that. Have you ever applied for a job there?" To this, Brown again answered in the negative. The trial court's implied rejection of his explanation "I don't get up there very often," as irrelevant to the question asked, is the type of argumentative response that would be more appropriate coming from a prosecutor on cross-examination.

{¶ 22} The trial court then asked Brown if he had considered moving in order to find a job. Ultimately provoking Brown's explanation that in his accustomed trade – satellite and cable installation – he cannot get a job because of his indictments for felony child support, "even though they were dismissed," the trial court responded: "And that's because of your behavior that you've had these felony indictments; is that right? These are your felony indictments, right." This was an argumentative question designed to undermine Brown's point that he could not find work, by pointing out that, in a sense, it was his fault that he could not get work for this reason, since it was his behavior that had resulted in the indictments. The trial court could not have had any serious doubt that the felony indictments were due to Brown's behavior; therefore, its question was rhetorical and argumentative. Again, this question was appropriate, or at least more appropriate, for a prosecutor in cross-examination, but not for a neutral, impartial and detached finder of fact.

{¶ 23} At the conclusion of its line of questioning about the previous non-support

indictments, the trial court made the following observation: "And it sounds to me like you paid enough money to get off diversion. As soon as you got off diversion, you stopped making your payments because you got indicted for the period of time right after that; is that fair?" The inclusion of the final "is that fair?" made this nominally a question, but it is obviously argumentative, impugning Brown's motives for having made the support payments he did make. Again, this is the sort of question that could be expected from a prosecutor during cross-examination, not from a neutral, impartial and detached finder of fact.

{¶ 24} The trial court then asked Brown if there was something that limited him to working in the cable industry. Brown said "yes." The trial court then asked "what?" Brown began to explain, "with those felonies," whereupon, the trial court interrupted his attempt to answer its question with: "I didn't ask you that," cutting him off before it could be determined whether his answer was responsive to the question asked.

{¶ 25} The court then began a series of questions that appear to have been a fishing expedition for evidence of Brown's ability to pay support. The trial court asked Brown where he stayed when he went to horse shows and flea markets at which he would sell body jewelry, incense, other items, knives, and would sharpen knives. If the trial court was hoping for evidence that he stayed at motels, it was disappointed, since his answer was that he stayed in the trailer in which he hauled his merchandise.

{¶ 26} The trial court asked Brown who owned the house he lived in. When advised that he now owned it, the trial court inquired further, establishing that Brown's dying mother had given him the house as part of her "final arrangements." The trial court was then at pains to establish that Brown had not been paying any rent when he lived with his mother.

**{¶ 27}** The trial court asked Brown if he had any tattoos. When Brown said he did, the trial court asked him when was the last time he had a tattoo. Again, the trial court may have been disappointed when Brown answered that it was "years ago," thereby refuting any suggestion that he had money for tattoos, but not for child support.

**{¶ 28}** In response to the trial court's question whether he had any legal obligation to support and take care of his mother, Brown responded: "No, I'm not. But I am her oldest son and that is an obligation." To this, the trial court responded: "Sir, that's not what I asked you. You don't have any legal obligation to support her. You don't have a court order that says you have to provide for her care, do you?" Since Brown had already acknowledged that he was under no legal obligation to support his mother, the trial court's question served only the argumentative purpose of rejecting as irrelevant Brown's interjection of his moral obligation to his dying mother.

**{¶ 29}** We conclude that the trial court, in its interrogation of Brown, ceased to be a neutral, impartial and detached finder of fact, aligning itself instead with the prosecution as a partisan – "entering the lists," in Judge Hand's words.

**{¶ 30}** Even in a jury trial, the presence on the bench of a judge who is not impartial constitutes a structural defect in the constitution of the trial mechanism – structural error – which defies analysis by harmless-error standards. *Arizona v. Fulminante, supra,* at 499 U.S. 309-310. Perforce, it is structural error when, in a bench trial, the judge who is also the finder of fact ceases to be impartial. A fundamental aspect of due process is trial by an impartial finder of fact. *See Tumey v. State of Ohio*, 273 U.S. 510, 535, 47 S.Ct. 437, 71 L.Ed. 749 (1927) ("No matter what the evidence was against [the defendant], he had the right to have an impartial judge

[in a bench trial].")

{¶ 31}   Brown did not object during the trial court's interrogation.   In our view, this is not fatal to his assignment of error.   To begin with, in a bench trial, when the trial court is the finder of fact, defense counsel is under a strong disincentive to lodge an objection that has as its basis a claim that the trial judge has ceased to be impartial.

{¶ 32}   More importantly, the requirement of a contemporaneous objection is rooted in the principle that judicial economy is best served by first giving the trial court an opportunity to correct its own error, before pursuing appellate remedies.   But that principle has limited application when the error is that the trial judge has ceased to be impartial.   A trial judge who has become partisan cannot be expected to correct the error, which, by its nature, has infected the judge's judgment in the case.

{¶ 33}   These considerations have led the Supreme Court of Illinois to hold that "a less rigid application requiring timely and proper objection and preservation of rulings thereon should prevail where the basis for the objection is the conduct of the trial judge[,] than is otherwise required."   *People v. Sprinkle*, 27 Ill.2d 389, 401, 189 N.E.2d 295 (1963).

{¶ 34}   The First Assignment of Error is sustained.


### V.   Brown's Other Assignments of Error Are Moot

{¶ 35}   Brown's Second and Third assignments of error are as follows:

THE   APPELLANT   WAS   DEPRIVED   OF   THE   EFFECTIVE ASSISTANCE   OF   COUNSEL   AS   GUARANTEED   BY   THE   SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION WHEN TRIAL

COUNSEL FAILED TO OBJECT TO THE IMPROPER INTERROGATION OF A WITNESS BY THE JUDGE AS PROVIDED IN RULE 614(C) OF THE OHIO RULES OF EVIDENCE.

THE DECISION OF THE TRIAL COURT IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 36} In view of our disposition of Brown's First Assignment of Error, his other assignments of error are overruled as moot.

## VI. Conclusion

{¶ 37} Brown's First Assignment of Error having been sustained, and his other assignments of error having been overruled as moot, the judgment of the trial court is Reversed, and this cause is Remanded for a new trial. In view of the error found, we suggest that this cause be assigned to another trial judge.

. . . . . . . . . . . . .

DONOVAN, J., concurs.

WELBAUM, J., dissenting:

## The Trial Court's Interrogation

{¶ 38} I very respectfully dissent. In this bench trial for criminal non-support, the trial court's questioning of defendant, after the direct and cross-examinations, was not improper, and trial counsel was not ineffective for having failed to object to the trial court's questions. Even though the majority's opinion has rendered the issue moot, the trial

court's finding that defendant had failed to prove the defense of inability to pay is not against the manifest weight of the evidence. I would affirm the trial court.

{¶ 39}    After the State's cross-examination of Brown was complete, the trial court began to question him. This quoted exchange is contained in the majority's opinion. Thereafter, counsel for Brown was permitted to examine him on re-direct regarding any questions raised by the trial court's questioning.

### The Trial Court's Interrogation Was Not Improper

{¶ 40}    Brown asserts the following as his First Assignment of Error:

THE TRIAL COURT ERRED BY FAILING TO INTERROGATE

A WITNESS IN AN IMPARTIAL MANNER AS REQUIRED BY RULE

614(B) OF THE OHIO RULES OF EVIDENCE.

{¶ 41}  Brown contends that the trial court exceeded the permissible scope of Evid.R. 614(B) when proceeding to ask questions of him while he was on the witness stand.

{¶ 42}    "Evid.R. 614(B) permits a trial judge to interrogate a witness as long as the questions are relevant and do not suggest a bias for one side or the other." *State v. Blankenship,* 102 Ohio App.3d 534, 548, 657 N.E.2d 559 (12th Dist.1995). The rule allows a trial judge to question witnesses, whether those witnesses are called by one of the parties, or by the court itself. Absent "any showing of bias, prejudice, or prodding of a witness to elicit partisan testimony, it will be presumed that the trial court acted with impartiality [in

propounding to the witness questions from the bench] in attempting to ascertain a material fact or to develop the truth." *State v. Baston,* 85 Ohio St.3d 418, 426, 709 N.E.2d 128 (1999), quoting *Jenkins v. Clark,* 7 Ohio App.3d 93, 98, 454 N.E.2d 541 (2d Dist.1982). Furthermore, a trial court enjoys even greater freedom in questioning witnesses during a bench trial, because the court cannot prejudicially influence a jury with its questions or demeanor. *Yurkowski v. Univ. of Cincinnati*, 10th Dist. Franklin No. 11AP-974, 2013-Ohio-242, ¶ 61. The appropriate standard of review is whether the trial court abused its discretion in its questioning of the witnesses. *State v. Davis*, 79 Ohio App.3d 450, 454, 607 N.E.2d 543 (4th Dist. 1992).

{¶ 43} A review of the questions asked by the trial court shows that the questions were consistently directed toward clarification of facts about which Brown testified-specifically, the lack of a job-market in his area, and his attempt to find employment. "Queries posed by a trial judge for the purpose of clarification of material facts do not qualify as improper examination." (Citation omitted.) *City of Mentor v. Brancatelli,* 11th Dist. Lake No. 97-L-011, 1997 WL 772949, *3 (Dec. 5, 1997). The questions asked by the judge were impartial and narrow in scope – again limited to the job market in Brown's locale as well as his attempts to obtain employment.

{¶ 44} Although there are a few instances in the transcript where the trial court felt obliged to point out to Brown that his answers were not responsive to the question it had put to him, I do not conclude from those instances that the trial court was biased or prejudiced against Brown.

{¶ 45} Following the questioning by the trial court, defense counsel was permitted to follow up with re-direct examination. I find no abuse of discretion and would overrule the First Assignment of Error.

**Trial Counsel Was Not Ineffective for Having**

**Failed to Object to the Trial Court's Interrogation**

{¶ 46} Brown's Second Assignment of Error is as follows:

THE APPELLANT WAS DEPRIVED OF THE EFFECTIVE ASSISTANCE OF COUNSEL AS GUARANTEED BY THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION WHEN TRIAL COUNSEL FAILED TO OBJECT TO THE IMPROPER INTERROGATION OF A WITNESS BY THE JUDGE AS PROVIDED IN RULE 614(C) OF THE OHIO RULES OF EVIDENCE.

{¶ 47} Brown contends that he was denied the effective assistance of trial counsel, because counsel did not interpose any objections during the trial court's questioning of Brown, while he was on the witness stand.

{¶ 48} In order to reverse a conviction based on ineffective assistance of counsel, it must be demonstrated that trial counsel's conduct fell below an objective standard of reasonableness and that the errors were serious enough to create a reasonable probability that, but for the errors, the result of the trial would have been different. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) at paragraph two,

sections (a) and (b) of the syllabus, adopted by the Supreme Court of Ohio in *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989). Trial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance. *Id.* at paragraph two section (a) of the syllabus.

{¶ 49}    As noted above, concerning Brown's First Assignment of Error, I find no abuse of discretion on the part of the trial court with regard to the questions asked of Brown. I would overrule Brown's Second Assignment of Error.

**Brown's Non-Support Conviction Is Not**

**Against the Manifest Weight of the Evidence**

{¶ 50}    Brown's Third Assignment of Error provides as follows:

THE DECISION OF THE TRIAL COURT IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 51}    Brown contends that the evidence shows "that [he] struggles financially to honor his familial obligations in a small town in the Appalachian mountains of rural Virginia. His talents are limited, his education is limited, his health is limited, job opportunities are limited – and yet he goes out on the road on weekends six months a year to sell his wares and chops firewood in the winter to get by." Thus, he argues that he proved, by a preponderance of the evidence the affirmative defense of inability to pay.

{¶ 52}    "A weight of the evidence argument challenges the believability of the evidence, and asks which of the competing inferences suggested by the evidence is more

believable or persuasive." (Citation omitted.) *State v. Whitmore*, 2d Dist. Miami No. 01CA28, 2002 WL 191656, *3 (Feb. 8, 2002). When evaluating whether a conviction is contrary to the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997)*, citing *State v. Martin,* 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

**{¶ 53}** Because the trier of fact sees and hears the witnesses at trial, we must defer to the fact finder's decisions whether, and to what extent, to credit the testimony of particular witnesses. *State v. Lawson,* 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997). However, we may determine which of several competing inferences suggested by the evidence should be preferred. *Id.* A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin* at 175.

**{¶ 54}** Brown was charged with a violation of R.C. 2919.21(B). The statute provides that "[n]o person shall abandon, or fail to provide support as established by a court order to, another person whom, by court order or decree, the person is legally obligated to support." R.C. 2919.21(B). "It is an affirmative defense to a charge of * * * failure to provide support established by a court order under division (B) of this section that the accused was unable to provide adequate support or the established support but did

provide the support that was within the accused's ability and means." R.C. 2919.21(D). "The burden of going forward with the evidence of an affirmative defense, and the burden of proof, by a preponderance of the evidence, for an affirmative defense, is upon the accused." R.C. 2901.05(A). Thus, in order to prove his affirmative defense of inability to pay, Brown had the "burden of proving by a preponderance of the evidence that: (1) he was unable to provide the court-ordered support; and (2) he did provide such support as was within his ability and means." *State v. Harris,* 10th Dist. Franklin No. 05AP-1303, 2006-Ohio- 5092, ¶ 7.

{¶ 55} Even without the testimony elicited by the trial court, I conclude that the trial court's finding against Brown on his defense of inability to pay is not against the manifest weight of the evidence. Brown has his GED and some college education. Although Brown testified that he did submit job applications in his trade field, and it is understandable that he would seek employment within this field, the fact remains that he failed to pursue jobs in other industries. The evidence shows that he is in good health, without any physical disabilities, but remained self-employed, despite the fact that he only made "fair" wages. He admitted that he did not apply for any of the jobs listed in his newspaper's classified ads, and he never applied for any jobs with local fast-food restaurants.

{¶ 56} Furthermore, that same testimony – taken before the trial court interposed its questions – shows that despite his circumstances, Brown was able to maintain a smoking habit and a cellular telephone. He was able to meet his child support obligations

for his child in Virginia, and he helped his wife meet her child support obligations. He also was able to take care of his mother. Yet he still failed to make payments toward his support obligation for his children in Ohio.

{¶ 57}   I conclude that the trial court's finding against Brown on his defense of inability to pay is not against the manifest weight of the evidence. Accordingly, I would overrule Brown's Third Assignment of Error.

### Conclusion

{¶ 58}   I would overrule all of Brown's Assignments of Error and would affirm the judgment of the trial court. I very respectfully dissent.

. . . . . . . . . .

Copies mailed to:

Mathias H. Heck
Michele D. Phipps
Gary C. Schaengold
Hon. Mary K. Huffman