[Cite as *Holt v. Feron*, 2018-Ohio-3318.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## MARION COUNTY


DANIELLE HOLT,

        CASE NO. 9-17-43

    PETITIONER-APPELLEE,

    v.

ERIC FERON,                  O P I N I O N

    RESPONDENT-APPELLANT.


**Appeal from Marion County Common Pleas Court**
**Trial Court No. 17-CV-0453**

**Judgment Affirmed**

**Date of Decision:  August 20, 2018**


**APPEARANCES:**

    *Rocky Ratliff* **for Appellant**

**WILLAMOWSKI, P.J.**

{¶1} Respondent-appellant Eric Feron ("Feron") brings this appeal from the judgment of the Court of Common Pleas of Marion County granting a Civil Stalking Protection Order ("CSPO") to petitioner-appellee Danielle Holt ("Holt"). Feron claims that the trial court's judgment was 1) not supported by sufficient evidence and 2) against the manifest weight of the evidence. Feron also claims that the trial court erred by asking the witnesses questions on behalf of Holt. For the reasons set forth below, the judgment is affirmed.

{¶2} On September 15, 2017, Holt filed a petition for a CSPO on behalf of herself and her child. Doc. 1. The petition alleged that Feron was continuously contacting Holt after repeatedly being asked to stop, had acted violently against Holt in the past, and had indicated to Holt that he would "never leave [her] alone." *Id.* Holt alleged that she had tried multiple times to block Feron and had even moved, but Feron continued to find ways to have contact with her. *Id.* An ex parte CSPO was granted on that same day with a full hearing scheduled for September 29, 2017. Doc. 2. The hearing was continued twice at the request of Feron. Doc. 8 and 12.

{¶3} The hearing was held on October 19, 2017. Holt appeared pro se and Feron was represented by counsel. Tr. 5. Holt testified at the hearing that she and Feron had been in a relationship. Tr. 10. Near the end of June, he was drunk and physically assaulted her. Tr. 16. Holt testified as follows.

> **[Feron] choked me out, threw me in a corner, spit in my face, chest-butted me, start – wanted to actually fist fight me, at the size he is right now, he was almost probably a hundred pounds bigger. I've never seen him this small in my life. I would never fight him. Like I told you the first time, most inmates don't even intimidate me as much as he's intimidated me.**

Tr. 16-17. Holt also indicated that he had locked her in her room all night while he blocked the door and had her phone. Tr. 20. She ended the relationship soon afterward. Feron then began calling and texting her repeatedly. Tr. 8, 10, Ex. 6. He would also message her on eBay and Facebook. Tr. 11, Ex. 1. He began messaging a man she was dating on Facebook and telling him that the man was not good enough for Holt and was just being used. Tr. 12, Ex. 3. When her date and Holt blocked Feron on Facebook, he found the man's brother and started messaging him about Holt as well. Tr. 13, Ex. 4. Holt indicated that after she blocked him from calling her, he would continue to get through. Tr. 8, 10, 13. She then had to get a new phone and number to keep him from contacting her. Tr. 8. That is when he started messaging her through her eBay store. Tr. 11, Ex. 1. Holt also testified that due to the excessive communication and her fear of him, Feron was banned from her place of employment. Tr. 8. According to Holt, she would communicate with Feron for limited time periods to try and resolve the situation, but he would continuously ask to meet with her. Tr. 55-58, 67. She did not want to do so because she was afraid of what could happen. Tr.19, 67. Holt also indicated that Feron was contacting her friends and harassing them about her. Tr. 13, Ex. 1, Ex. 5. At one

point, Feron even appeared at her new home with her ex-boyfriend, Jeffrey Schertzer ("Schertzer"), who was dropping off her son. Tr. 14.

**{¶4}** Holt presented exhibits showing the messages sent to her by Feron, including ones that indicated he knew where she was, what she was doing, and who she was with when he should not have had that knowledge. Tr. 10, Ex. 1. Feron had also told her that he would not leave her alone, and that they would be back together. Tr. 17. In one message, Feron stated that he was the only one Holt would marry. Tr. 17. Feron had even contacted her doctor and indicated to him that she was a drug addict causing her to be required to undergo drug testing before her doctor would renew her prescription medicine for depression and anxiety. Tr. 7-8. As a result, Holt indicated that after trying for months to get Feron to leave her alone, she applied for the restraining order because she was afraid of what he would do. Tr. 7, 18. Holt testified that she believed that Feron would cause her physical harm. Tr. 18. Holt testified that Feron had caused her extreme mental distress by the "nonstop" harassment. Tr. 19. She testified that since being granted the temporary CSPO, her life has been the best it had been in a while. Tr. 17. She stated that she was once again "able to do things with my son outside, leave my door open, my niece is able to come over now, because my sister's terrified of him. She will not let my niece around." Tr. 17. Holt also indicated that she had brought a box containing Feron's possessions for him to take because she had not wanted to meet with him in person previously. Tr. 18. "To me it's just unpredictable. Will

he cause physical harm? I don't know. I never thought he would before, but then he did." Tr. 19.

{¶5} On cross-examination, Holt admitted that although she and Feron had ended the relationship in January, they continued to be friends and socialize. Tr. 72-73. Holt also admitted that Feron had given her items and money, but claimed they were gifts, not loans. Tr. 45-46. Holt denied asking Feron for money and denied owing him money. Tr. 46, 60. In Holt's opinion, Feron's claim of money owed was a pretext for calling her because he kept changing the amount he claimed she owed him. Tr. 59. Holt indicated that she had offered to mail Feron the credit card, but he wanted her to return it personally. Tr. 66-67. Holt also admitted going places with Feron and her son in the month before she ended the relationship. Tr. 63-65. When questioned by the trial court, Holt admitted that Feron had never harmed her son or threatened him and she had no reason to think Feron would either physically harm the boy or cause the boy mental distress. Tr. 76.

{¶6} After Holt testified, Feron presented the testimony of Schertzer. Schertzer testified that he did not believe Feron was a threat to his son. Tr. 80. Schertzer indicated that he took Feron to Holt's now home because Feron and Schertzer had previously had plans to go to dinner and to a bar to watch a fight. Tr.. 79. Schertzer testified that Holt never told him she was afraid of Feron, but had told him she did not want Feron around the boy. Tr. 81. On cross-examination, Schertzer admitted that even though he knew Holt had a restraining order, he did

not keep Feron away from the boy because he did not feel he had to enforce it. Tr. 84.

{¶7} Feron then testified that he lives an hour and a half away and works in Cleveland. Tr. 86. Feron indicated that he was challenging the CSPO because it would his affect his security clearance with NASA and because he wanted to continue to have a relationship with the child. Tr. 86. Feron admitted that he and Holt ended their relationship in January, but indicated that they were once again in a sexual relationship. Tr. 92. Feron claims that he was constantly helping Holt because she had no real friends. Tr. 87, 95. Feron also testified that Holt had asked him to move in with her in May. Tr. 93. Feron did not deny that he and Holt had argued and that he had shoved her on June 10. Tr. 90. According to Feron, they both were drinking and he was taking a prescription medicine that reacted to the alcohol, which affected his behavior. Tr. 90. Feron denied there was anything more serious and claimed that they spent the night in the same bed. Tr. 91. Feron also testified that the next day he asked Holt if she wanted him to leave and she said no. Tr. 91. Feron believes that Holt was using him and dumped him on July 14, 2017, after she had been dating someone else. Tr. 87, 98-99. Feron decided by the end of July to just be friends with Holt and move on with his life. Tr. 100. However, Feron admitted that he had called her doctor in early August to tell the doctor that Holt was a drug addict to allegedly try and protect her son. Tr. 100-101. Feron testified that he had asked Holt to return his credit card through the mail, but she had never

done so.  Tr. 103-105, Ex. G.  Part of the reason for the repeated contact was to try and have his money and possessions returned.  Tr. 106.  Feron admitted that some of the texts were questioning why they were no longer together.  Tr. 112.

{¶8} On cross-examination by Holt, Feron testified that he did not consider 10-20 texts a day to be excessive when you are not dating.  Tr. 115.  When asked how he knew who she was friending on Facebook after she had blocked him, Feron merely answered "You know my memory.  That was three months ago and we were still friends, okay?".  Tr. 120.  He also admitted that as of late June, they were no longer considering living together.  Tr. 121.

{¶9} The trial court then asked Feron some questions without objection.  The trial court asked Feron if he knew Holt was blocking his calls.  He claimed he did not know because he had blocked her number in March because he "knew we had the second line of communication."  Tr. 123.  The trial court then asked him if he knew that Holt did not want him to call her when he messaged her on eBay between August 12 and September 4.  Tr. 123-24.  Feron said he messaged her on eBay because Holt had told him she was going to block his number on her phone and he presumed she had done so.  Tr. 124.  According to Feron, he contacted her through eBay to try for "business", to recover his credit card, property, and money.  Tr. 124.  When the trial court pointed out that most of the messages had nothing to do with that issue, Feron changed his reason to saying he was contacting her because he was hurt.  Tr. 126-27.  Feron admitted that some of the texts were inappropriate.  Tr.

127. When questioned about why he was contacting other people, and telling Holt that he was doing so, Feron indicated that he felt he had to warn them about Holt and wanted Holt to know he was doing so. Tr. 128. Feron's counsel then conducted a redirect examination. Tr. 129. Feron then testified that he contacted other people to protect them from Holt. Tr. 129.

{¶10} Feron then called Holt to the stand on cross-examination. Tr. 129. Holt testified that she had been taking medicine for depression and anxiety for 10-12 years. Tr. 130. She indicated that she had not had an episode of depression in a long time. Tr. 130. Following her testimony, Holt notified the court that she had brought items belonging to Feron to the hearing to be returned, including the credit card that Feron had been wanting back. Tr. 136. Feron indicated that what was there was acceptable. Tr. 137. The trial court then informed Feron that if there were any other financial issues, they would need to be decided in other litigation. Tr. 137.

{¶11} At the conclusion of the hearing, the trial court determined that Holt's testimony was generally credible and that Feron's testimony with respect to the reasons for some of the contacts, lacked credibility. Tr. 138. The trial court focused primarily on the eBay messages from August 12 to September 4. Tr. 138. The trial court determined that Feron knew at that time that Holt did not wish to be contacted by him and that the purpose of the contacts was to create mental distress and place Holt in fear. Tr. 138. The trial court noted all of the actions taken by Holt to stop

the contact and Feron's contact of other people to continue to try and isolate Holt. Tr. 138-139. Based upon these findings along with Holt's testimony about the prior assault, the trial court granted the CSPO as to Holt, but did not grant it as to the child finding no contact was designed to either place the child in fear or cause mental distress. Tr. 139. On November 21, 2017, Feron filed his notice of appeal. Doc. 19. On appeal, Feron raises the following assignments of error.

**First Assignment of Error**

**The record contains insufficient evidence to support the [CSPO] for [Holt].**

**Second Assignment of Error**

**The [CSPO] granted for [Holt] is contrary to the manifest weight of the evidence.**

**Third Assignment of Error**

**The trial court erred by asking witnesses questions on behalf of [Holt].**

*Sufficiency of the Evidence*

{¶12} In the first assignment of error, Feron claims that the judgment of the court was not supported by sufficient evidence. The Supreme Court of Ohio has defined sufficiency of the evidence as a test of adequacy of the evidence and is a matter of law. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E. 2d 517. In reviewing the sufficiency of the evidence, an appellate court must view the evidence in a light most favorable to the prevailing party and determine whether

the judgment was supported by competent credible evidence. *Henry Cty. Dog Warden v. Henry Cty. Humane Soc.*, 3d Dist. Henry No. 7-16-06, 2016-Ohio-7541, 64 N.E.3d 1076.

{¶13} In this case, Holt was seeking a CSPO pursuant to R.C. 2093.214. This statute provides that the CSPO may be granted if the actions of the respondent amount to a violation of R.C. 2903.211, Menacing by Stalking.

> **(A)(1) No person by engaging in a pattern of conduct shall knowingly cause another person to believe that the offender will cause physical harm to the other person or a family or household member of the other person or cause mental distress to the other person or a family or household member of the other person. In addition to any other basis for the other person's belief that the offender will cause physical harm to the other person or the other person's family or household member or mental distress to the other person or the other person's family or household member, the other person's belief or mental distress may be based on words or conduct of the offender that are directed at or identify a corporation, association, or other organization that employs the other person or to which the other person belongs.**
>
> **(2) No person, through the use of any form of written communication or any electronic method of remotely transferring information, including, but not limited to, any computer, computer network, computer program, computer system, or telecommunication device shall post a message or use any intentionally written or verbal graphic gesture with purpose to do either of the following:**
>
> **(a) Violate division (A)(1) of this section;**
>
> **(b) Urge or incite another to commit a violation of division (A)(1) of this section.**

R.C. 2903.211. A pattern of conduct is defined as two or more actions or incidents closely related in time. R.C. 2903.211(D)(1). Mental distress is defined as a mental illness or condition involving a temporary substantial incapacity or would normally require mental health services, regardless of whether the services are received or requested. R.C. 2903.21(D)(2). "Incapacity is substantial if it has a significant impact upon the victim's daily life." *State v. Horsley,* 10th Dist. Franklin No. 05AP-350, 2006-Ohio-1208, ¶ 48.

{¶14} On appeal, Feron challenges three elements of the statute: 1) Whether there was a pattern of conduct; 2) Whether it was knowing; and 3) Whether it would cause another person to fear physical harm or mental distress. The first claim is that there was not a pattern of conduct because there was only one instance of violence in June. However, the evidence shows in the weeks prior to the petition for a CSPO, Feron sent multiple messages to Holt through her eBay account because that was the only way he could contact her due to him being blocked by her phone and Facebook. Feron contacted her through eBay on August 12, August 26, August 27, September 1, and September 4. Ex. 1. While a couple of the messages talked about the money he claimed she owed him, most of them had to do with their relationship, how he believed she was cheating on him, and what a great friend he was to her. Feron was telling her details about where she had been the prior night and the man she was dating then. These were details that he should not have generally had. He also made comments about another person she had chosen to date. In other

messages he was threatening to contact people and tell them "the truth" about her. The tone of the messages ranged from trying to reestablish a friendship to insulting and intimidating. When questioned about these messages, Feron indicated that they were "inappropriate". The repeated messages over a series of days meets the definition of a pattern of conduct.

{¶15} Next, Feron claims that the evidence was insufficient to find his actions were knowing. When directly questioned, Feron claimed he did not know that Holt did not wish to speak with him. However, he admitted that he presumed she had blocked him on her phone because she told him she was going to do so. That is the reason why he contacted her through eBay. Additionally, in his own exhibit of text messages, Holt tells him to stay away from her house and that she sees him as a threat to her safety. Ex. B at 79. On the morning of August 27, she texted him and told him again that she was blocking him and she wanted him to stay out of her life. *Id.* at 80. On August 12, during the messaging through eBay, Holt told him to stop messaging her and to leave her alone. Ex. G. Then on August 27, through the eBay messages, Holt again told him to stop messaging her, that they were not friends, and that he should leave her alone. *Id.* The evidence before the trial court was sufficient to establish that Feron knew that Holt did not want him to contact her.

{¶16} Finally, Feron claims that the evidence was not sufficient to show that Holt suffered mental distress or was in fear of physical harm. An actual threat of

physical harm to the victim is not required to satisfy the element of the statute. *State v. Beckwith*, 8th Dist. Cuyahoga No. 104683, 2017-Ohio-4298, 82 N.E.3d 1198. In fact, the victim need only show that the defendant knowingly intended to cause mental distress, not that actual mental distress occurred. *Horsley, supra* at ¶ 47. Evidence of a change in routine can corroborate a finding of mental distress. *Smith v. Wunsch*, 162 Ohio App.3d. 21, 2005-Ohio-3498, 832 N.E.2d 757. Holt testified that she had been forced to change her phone number two times, and to block Feron on Facebook, only to find that he could still contact her through her store on eBay. She testified that she had been forced to speak with the investigators at the prison where she worked to keep him away from the grounds because she was afraid of what Feron would do. She moved to a new home and did not give the address to people, instead choosing to get a post office box so that her address would not be easily found through an internet search. Yet two days after she moved, Feron showed up at her new home with Schertzer. She was no longer going outside the house with her son, her niece was no longer allowed to visit, and she did not park out of the garage because she was afraid of what Feron would do. She testified that although she had not previously believed that Feron was violent, she was not sure after the last incident. In the messages that Feron submitted as exhibits, Holt repeatedly indicates that she is afraid of Feron. Ex. B, G. Additionally, she has a history of depression and anxiety. Feron was attempting to isolate her by turning her friends away from her. Viewing the evidence most favorable to Holt, a trial

court could reasonably find that Feron had intended to cause mental distress to Holt through his behavior and that Holt had suffered a substantial incapacity as his actions had a significant impact on her life. After a review of the record, this court concludes that there was sufficient evidence to support the judgment of the trial court. The first assignment of error is thus overruled.

*Manifest Weight of the Evidence*

{¶17} Feron argues in the second assignment of error that the judgment of the trial court was against the manifest weight of the evidence.

> **Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief."**

*State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52, 678 N.E.2d 541 (citing Black's Law Dictionary (6 Ed.1990) 1594). A new trial should be granted only in the exceptional case in which the evidence weighs heavily against conviction. *Id*. Although the appellate court acts as a thirteenth juror, it still must give due deference to the findings made by the trier of fact.

> **The fact-finder * * * occupies a superior position in determining credibility. The fact-finder can hear and see as well as observe the body language, evaluate voice inflections, observe hand gestures, perceive the interplay between the witness and the examiner, and watch the witness' reaction to exhibits and the like. Determining credibility from a sterile transcript is a Herculean endeavor. A**

-14-

> **reviewing court must, therefore, accord due deference to the credibility determinations made by the fact-finder.**

*State v. Thompson*, 127 Ohio App.3d 511, 529, 713 N.E.2d 456 (8th Dist. 1998). "To that end, the fact finder is free to believe all, part or none of the testimony of each witness appearing before it." *State v. Redman*, 3d Dist. Allen No. 1-15-54, 2016-Ohio-860, ¶ 31 quoting *State v. Petty*, 10th Dist. Franklin Nos. 11AP-716, 11AP-766, 2012-Ohio-2989, ¶ 38. In weighing the evidence, the appellate court must give the evidence and interpretation which is consistent with the verdict and judgment if possible. *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). The same standard of review used in a criminal case is used to review the manifest weight of the evidence in a civil case, just using a different burden of proof. *Eastley*, *supra at* ¶ 19-20.

{¶18} Here, there is no question that both parties presented very different stories to the trial court. Feron, in support of his appeal, points to all of the evidence he presented to show that he was merely trying to work out a relationship, get his property back, and get repaid for loans. However, the evidence can also be interpreted as harassing to Holt and intended to cause mental distress by making threats of continued harassment to her. The trial court found that Feron's testimony regarding his motives for the contact to be lacking in credibility. The trial court also determined that Feron knew that Holt did not wish to continue to receive contact from Feron. As for retrieving his property, Feron had other options for achieving

that purpose, such as using the legal system as pointed out by the trial court. Feron instead chose to continue to contact Holt to do so even after she had repeatedly asked him not to do so. Although the evidence could possibly have supported either verdict by the trial court, depending upon whom the trial court found to be more credible, a review of the evidence does not show that it weighs heavily in favor of a verdict for Feron or that a miscarriage of justice occurred. Thus, the judgment is not against the manifest weight of the evidence and the second assignment of error is overruled.

*Questioning of Witnesses*

**{¶19}** In the third assignment of error, Feron claims that the trial court erred by asking questions of the witnesses. The trial court may interrogate a witness in an impartial manner whether called by the trial court or by a party. Evid.R. 614(B). If a party has an objection to the interrogation, the party may object "at the time or at the next available opportunity when the jury is not present." Evid.R. 614(C).

> **A trial court is obligated to control the proceedings before it, to clarify ambiguities, and to take steps to ensure substantial justice. * * * Accordingly, a trial court should not hesitate to pose pertinent and even-handed questions to witnesses. * ** Further, a trial court enjoys even greater freedom in questioning witnesses during a bench trial because the court cannot prejudicially influence a jury with its questions or demeanor. * * ***

*Yurkowski v. Univ. of Cincinnati*, 10th Dist. Franklin No. 11AP-974, 2013-Ohio-242, 989 N.E.2d 1051, ¶ 61 (internal citations omitted). A trial court is presumed to act impartially in its questioning of a witness with the intent to ascertain a material

fact or to develop the truth absent a showing of bias, prejudice, or prodding of a witness. *In re Disqualification of Solovan*, 100 St.3d 1214, 2003-Ohio-5484, 798 N.E.2d 3 at ¶ 6 quoting *State v. Baston,* 85 Ohio St.3d 418, 426, 709 N.E.2d 128 (1999). Additionally, if a party seeks to challenge the court's questioning of a witness, they must raise an objection. *Solovan* at ¶ 7. "The failure of a party to object in accordance with Evid.R. 614(C) waives consideration of the claimed error on appeal because the failure to object deprives the trial court of any opportunity to correct the alleged error." *State v. Davis*, 79 Ohio App.3d 450, 455, 607 N.E.2d 543 (4th Dist. 1992). *See also Solovan* at ¶ 7, *City of Lima v. Hile*, 3d Dist. 1-91-77, 1992 WL 292403 (Oct. 15, 1992), and *Jenkins v. Clark*, 7 Ohio App.3d 93, 98, 454 N.E.2d 541 (2d Dist. 1982). Without an objection, the consideration is limited to one of plain error. *Baston, supra* at 425 and *State v. Grad*, 9th Dist. Medina 10CA0003-M, 2012-Ohio-1358, ¶ 45.

{¶20} Feron argues in his third assignment of error that the questions asked by the trial court to Feron were not impartial. Initially this court notes that in addition to asking questions of Feron, the trial court also asked multiple questions of Holt and one question of Jeffrey Schertzer ("Schertzer"), the father of Holt's son listed in the petition and a friend of Feron. Additionally, at no point did Feron ever object to any question asked by the trial court. Evidence Rule 614(C) requires one claiming error in the questioning to raise it at the time of trial for the issue to be considered on appeal. Since this was a bench trial, there was no jury that might be

prejudiced and the objections should have been made at the time of the questioning. This did not occur, thus the trial court had no opportunity to address the issue.

**{¶21}** Due to the failure to object, any consideration we do is limited to one of plain error. "An alleged error 'does not constitute a plain error * * * unless, but for the error, the outcome of the trial clearly would have been otherwise.' " *Batson, supra* at 425 quoting *Jenkins, supra* at 98. The mere fact that the evidence elicited by a trial court's questioning is potentially damaging to a party does not show a bias. *State v. Lowe*, 9th Dist. Summit No. 25862, 2012-Ohio-907, ¶ 19.

> **"When a trial judge is acting as a finder of fact, the judge is necessarily weighing the credibility of each witness while the witness is giving testimony. No finder of fact can avoid doing so. As long as the trial judge does not badger or otherwise intimidate the witness, we can see no prejudice when the trial judge articulates the process by which he is assessing the credibility of the witness when there is no jury to be influenced by it." *State v. Armstrong*, 2d Dist. No. 13498, 1993 WL 294834 at \*6 (Aug. 6, 1993). A trial judge who pushes a defendant or other defense witness on cross-examination, may be benefitting rather than prejudicing the defendant by letting him know what problems the judge may have with the testimony at a time when the defendant may yet do something about it. *Id*.**

*Lowe* at ¶ 20.

**{¶22}** Feron claims that the trial court was biased against him because he basically "proceeded to perform what appears to be a cross-examination of his own". Appellant's Brief at 16. There is no question that the trial court in this matter was very engaged in the trial and asked multiple questions of both Holt and Feron. These questions brought out information damaging to both sides. For example, the

trial court specifically asked Holt multiple questions that led to her admitting that there was no basis for her to fear that Feron was either a physical or psychological danger to her son. No objections were made to these questions. A review of the record does show that although the trial court was slightly more aggressive with Feron, Feron was more evasive with his answers. For example, when Holt was questioned as to whether she had any reason to believe that Feron would harm her son, she responded with "I don't have a reason to think that he would." Tr. 76. When asked if any threats had been made against her son, she simply answered no. Tr. 76. Compare that to the questioning cited by Feron placed into context.

> **The Court: When you're messaging her on eBay, that was because you – she had – you knew she didn't want you to call her, right?**
>
> **Feron: It's because –**
>
> **The Court: Yes or no?**
>
> **Feron: I didn't know – no, at that time I did not know if I was blocked or not. I never –**
>
> **The Court: Then why would you message her on eBay?**
>
> **Feron: She said she was gonna block me so I assume she did.**

Tr. 123-24. Throughout his testimony, Feron was arguing that the sole reason he was contacting Holt was to retrieve his property. Yet the eBay messages from August 12 to September 4, 2017, presented a different story. That was the issue being addressed by the trial court. At the end of the trial court's questioning, Feron

had indicated that he had sent inappropriate texts to her and that he was texting other people to warn them of her manipulative behavior and to protect them. Tr. 127-28. This argument was then pursued further by counsel for Feron on redirect after the trial court's questions. Since the issue was relevant to the matter before the trial court and Feron was able to then address the questions raised by the trial court, this court does not find that the questions were so indicative of bias that the outcome would have changed. For this reason, the third assignment of error is overruled.

{¶23} Having found no error in particulars assigned and argued, the judgment of the Court of Common Pleas of Marion County is affirmed.

*Judgment Affirmed*

**ZIMMERMAN and PRESTON, J.J., concur.**

**/hls**