[Cite as *State v. Hough*, 2024-Ohio-2430.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                                           :

    Plaintiff-Appellee,                          :

                                                No. 23AP-478
v.                                                      :       (C.P.C. No. 17CR-6061)

Richard M. Hough,                                       :       (REGULAR CALENDAR)

    Defendant-Appellant.                         :

---

D E C I S I O N

Rendered on June 25, 2024

---

**On brief:** *G. Gary Tyack*, Prosecuting Attorney, and *Sheryl L. Prichard*, for appellee. **Argued:** *Sheryl L. Prichard* and *Jeffrey Devereaux*, certified legal intern.

**On brief:** *Timothy Young*, Ohio Public Defender, and *Max Hersch*, for appellant.

---

APPEAL from the Franklin County Court of Common Pleas

LELAND, J.

{¶ 1} Defendant-appellant, Richard M. Hough, appeals from a judgment of conviction and sentence entered by the Franklin County Court of Common Pleas following a jury trial in which the jury returned verdicts finding him guilty of one count of aggravated vehicular homicide, three counts of aggravated vehicular assault, three counts of vehicular assault, and one count of operating a motor vehicle while under the influence of a drug of abuse.

## I. Facts and Procedural History

{¶ 2} On November 7, 2017, appellant was indicted on two counts of aggravated vehicular homicide, in violation of R.C. 2903.06, three counts of aggravated vehicular assault, in violation of R.C. 2903.08, three counts of vehicular assault, in violation of R.C.

2903.08, one count of operating a vehicle under the influence of alcohol, a drug of abuse, or a combination of them, in violation of R.C. 4511.19, and three counts of operating a motor vehicle while under the influence of a listed controlled substance or a listed metabolite of a controlled substance, in violation of R.C. 4511.19.

{¶ 3} The matter initially came for trial before a jury on August 26, 2019. Prior to jury deliberations, "[c]ounts 10, 11, and 12 of the indictment, the operating a vehicle while under the influence per se counts, were * * * dismissed * * * on the basis that [appellant's] blood sample was taken outside the three-hour window required for those counts." *State v. Hough*, 10th Dist. No. 19AP-682, 2021-Ohio-2198, ¶ 4 ("*Hough I*").

{¶ 4} On August 29, 2019, the jury returned verdicts finding appellant guilty of "Counts 1 through 9." *Id.* at ¶ 9. The trial court sentenced appellant by judgment entry filed September 12, 2019. In its entry, "[t]he court noted several counts merged and [appellant] was sentenced to 6 years on Count 1, as well as 3 years on Counts 3, 5, and 7, to be served consecutive to Count 1 and to each other, and 6 months on Count 9 to be served concurrently, for a total of 15 years." *Id.* at ¶ 10.

{¶ 5} Appellant appealed his convictions and raised three assignments of error, including a challenge to the trial court's failure to conduct a competency evaluation. In *Hough I*, this court overruled all three assignments of error and affirmed the judgment of the trial court. Appellant filed an appeal with the Supreme Court of Ohio which accepted jurisdiction over one proposition of law, i.e., that the trial court erred by not conducting a hearing on his motion for competency evaluation. In *State v. Hough*, 169 Ohio St.3d 769, 2022-Ohio-4436 ("*Hough II*"), the Supreme Court held this court erred in concluding the trial court's failure to hold a competency hearing was harmless error; the Supreme Court therefore vacated appellant's convictions and remanded the matter to the trial court "to provide * * * an inquiry into [appellant's] competency that is contemporaneous with his trial." *Id.* at ¶ 42.

{¶ 6} Following remand, the trial court conducted a hearing on February 16, 2023 regarding the court's receipt of a competency evaluation report dated February 2, 2023. The trial court noted the report, prepared by Benjamin J. Silber, Ph.D., found appellant "was malingering, in the examiner's opinion, and that because there's a presumption of competence and because of scales that he tested on indicating * * * he was either

malingering or faking or giving intentional responses to make him look not competent, the report concludes that he's competent." (Feb. 16, 2023 Tr. at 2-3.)

{¶ 7} On February 24, 2023, the trial court conducted an evidentiary hearing on the competency evaluation report. During the hearing, Dr. Silber testified on behalf of plaintiff-appellee, State of Ohio. At the conclusion of the hearing, the court indicated it would order a second competency evaluation of appellant. The trial court conducted a subsequent hearing on April 5, 2023, at which time the parties stipulated to a report prepared by Brian O'Reilly, Ph.D., dated March 30, 2023. In that report, Dr. O'Reilly concluded appellant "is competent to stand trial and able to assist with his defense and understand the nature of the charges and the objective of the proceedings." (Apr. 5, 2023 Tr. at 2-3.)

{¶ 8} On June 26, 2023, the matter came for retrial before a jury. During the retrial, in addition to the testimony of witnesses called to the stand, the state read portions of prior testimony from the first trial into the record due to the unavailability of several witnesses. The state initially read into the record the prior testimony of Amanda Griggs (hereafter "Amanda"), the mother of two children. On August 8, 2017, Amanda was a passenger in a vehicle driven by her mother-in-law, Betty Griggs (hereafter "Betty"). On that date, Betty picked up Amanda and her daughters and began driving to a Chuck E. Cheese restaurant at the Eastland Mall.

{¶ 9} Betty traveled on Refugee Road toward an exit ramp to merge onto State Route 33. As they entered the ramp, Amanda "heard Betty say something * * * like, 'Oh, my God' or something got my attention." (June 26, 2023 Tr. Vol. 1 at 36.) Amanda "looked up" and observed "a red truck or SUV where it shouldn't have been." (June 26, 2023 Tr. Vol. 1 at 36.) Amanda testified that Betty's vehicle was traveling in the correct direction, but the red vehicle was traveling against traffic. The "last thing" Amanda remembered was "the vehicle coming toward us," and then "[w]aking up in the hospital." (June 26, 2023 Tr. Vol. 1 at 36.)

{¶ 10} Amanda remained in the hospital for two months; she described her injures as follows: "My left arm was nearly severed. Broken. Nearly severed. Both of my legs were broken. I had 13 broken ribs. Internal bleeding. I ended up * * * losing my spleen. Having my spleen removed. Waking up unable to breathe, so I was intubated on a breathing

machine for several days." (June 26, 2023 Tr. Vol. 1 at 38-39.) Amanda testified she received pain medication, which was an issue for her because she "had been in recovery from addiction, opiate pain pill addiction, for some time." (June 26, 2023 Tr. Vol. 1 at 42.)

{¶ 11} Amanda's youngest daughter, who was two years of age at the time of the incident, suffered a "subdural hematoma," resulting in "staples and scars from the top of her head down the back of her head into the back." (June 26, 2023 Tr. Vol. 1 at 43.) Amanda's older daughter was hospitalized for one month and suffered "severe" trauma to her head and required "follow-up surgeries for her leg." (June 26, 2023 Tr. Vol. 1 at 44.) Amanda testified there were "ongoing concerns about her [older daughter's] development, intellectual and emotional development." (June 26, 2023 Tr. Vol. 1 at 44.) Amanda stated that her older daughter, who is currently in the fifth grade, "relates everything to before the accident and after the accident." (June 26, 2023 Tr. Vol. 1 at 45.)

{¶ 12} On August 8, 2017, Columbus Police Officer Robert Barrett prepared a search warrant for a blood draw, and he assisted other officers "with the execution of the search warrant" at Grant Hospital; a blood sample was drawn from appellant at 3:48 p.m. that day. (June 26, 2023 Tr. Vol. 1 at 56-57.)

{¶ 13} On August 8 2017, Wendy Duke, a paramedic with the Columbus Fire Department, responded to a motor vehicle accident on the freeway ramp at State Routes 104 and 33. Duke attended to a female accident victim, Betty, at the scene. Betty "was telling us she couldn't breathe," and "[s]he was starting to go cyanotic." (June 27, 2023 Tr. Vol. 2 at 82.) Medical personnel began CPR and transported Betty to the hospital. Medics administered "an oral pharyngeal airway," and paramedics "also tried to needle decompress [Betty] on both sides because we were concerned about air and blood in her chest cavity that was causing her not to be able to breath[e]." (June 27, 2023 Tr. Vol. 2 at 83.) After going into cardiac arrest, Betty died a short time later that day.

{¶ 14} At trial, Nicholas Baldauf, a forensic toxicologist, identified state's exhibit No. 120 as blood tubes drawn from appellant. Baldauf testified "the confirmatory test for cocaine and the cocaine metabolite came back positive." (June 27, 2023 Tr. Vol. 2 at 126.) The "cocaine reported at 236.92 nanograms per milliliter," and the cocaine metabolite "reported at 2340.49 nanograms per milliliter." (June 27, 2023 Tr. Vol. 2 at 126.)

{¶ 15} On August 8, 2017, Columbus Police Officer Duane Ward was dispatched to a reported accident at the interchange of State Routes 104 and 33. Upon arrival, Officer Ward observed two disabled vehicles, a "[b]lue Nissan Sentra going * * * east on the entrance ramp to 33 west or north," and a "maroon Chevy Tahoe * * * going basically west on the ramp facing the wrong direction so that the vehicle was going the wrong direction up the ramp." (June 27, 2023 Tr. Vol. 2 at 161.) Both vehicles had "[h]eavy front-edge damage." (June 27, 2023 Tr. Vol. 2 at 161.) Officer Ward testified the Tahoe, which had a West Virginia license tag, "was traveling the wrong way," and the Sentra was "going the correct way." (June 27, 2023 Tr. Vol. 2 at 174.)

{¶ 16} There were two adults and two children in the Sentra. Officer Ward observed "the gentleman" associated with the Tahoe "was not in it. He was kind of away from it sitting down." (June 27, 2023 Tr. Vol. 2 at 164.) The officer estimated this person was "five to seven feet" from the vehicle. (June 27, 2023 Tr. Vol. 2 at 168.) Officer Ward asked the man what happened, and if he was okay; in response, he "just said, 'Oh, man.' " (June 27, 2023 Tr. Vol. 2 at 170.) Officer Ward described the individual's behavior as "indifferent," meaning "when you feel that they are impaired. And certain actions, not much emotions, not much responding to two basic questions." (June 27, 2023 Tr. Vol. 2 at 173.) At trial, Officer Ward identified appellant as the person he observed that day.

{¶ 17} John Daniels, a forensic pathologist, testified the Franklin County Coroner's Office performed an autopsy of Betty, with a reported date of death of August 8, 2017. Daniels stated the cause of death was "multiple blunt force injuries," with the "most significant injury" being a "pontomedullary laceration," which "would almost instantaneously stop breathing and disruption of central nervous system control of the heart rate." (June 27, 2023 Tr. Vol. 2 at 222-23.)

{¶ 18} On August 8, 2017, Columbus Police Officer Dan Perez was dispatched to the accident scene, located at the "on-ramp that goes from eastbound 104 to State Route 33 towards Columbus in a northwesterly direction." (June 27, 2023 Tr. Vol. 2 at 234.) Officer Perez testified the Tahoe "belonged to the owner which came back to a Richard Hough out of Logan, West Virginia." (June 27, 2023 Tr. Vol. 2 at 256.) On August 26, 2017, Officer Perez interviewed David Cotter, who provided information about observing a red Tahoe

being driven erratically in the vicinity of the accident scene on the date of the events. At trial, the officer identified photographic exhibits taken of the accident scene.

{¶ 19} During retrial, the prior testimony of Phil Biggs was read into the record. On August 8, 2017, Biggs, a paramedic with the Columbus Fire Department, was dispatched to the scene at 12:56 p.m. Biggs was accompanied by firefighter Steve Elliott. Several other medics were already at the scene. Upon arrival, Biggs and Elliott "were assigned to the gentleman sitting on the edge of the east side of the ramp." (June 28, 2023 Tr. Vol. 3 at 316-17.) At the time, "the [p]atient was seated on the edge of the road about 40 feet from his vehicle." (June 28, 2023 Tr. Vol. 3 at 320.) Biggs testified that "[a]t some point during the evaluation, the patient," later identified as appellant, "indicated that the SUV across from where he was sitting was his vehicle." (June 28, 2023 Tr. Vol. 3 at 321.)

{¶ 20} Biggs prepared a report of his interaction with the patient, which stated in part: "Throughout the time with this patient he was difficult to get answers from due to talking in a low voice or refusing to answer. The patient got agitated when I pulled up the back of his shirt to look for injuries." (June 28, 2023 Tr. Vol. 3 at 322.) Biggs also noted in the report the patient "had a difficult demeanor throughout the run," and an "unwillingness to provide much information." (June 28, 2023 Tr. Vol. 3 at 323-24.) Medics "applied a c-collar" to appellant and "initially put him on a backboard," but the "[p]atient refused to lay backward so he had to be moved off of the backboard and onto [a] cot." (June 28, 2023 Tr. Vol. 3 at 325-26.) As Biggs was "preparing for an IV," the patient "immediately said he did not want one," stating "the last time someone had done that, he got medication that knocked him out." (June 28, 2023 Tr. Vol. 3 at 327.)

{¶ 21} Robert G. Topmiller, chief of toxicology at the Hamilton County Coroner's Office, performed a review of laboratory testing of appellant's blood samples. Topmiller opined "that the 236.92 nanograms per milliliter * * * of cocaine reported by the Ohio State Highway Patrol Crime Lab identified in [appellant's] blood would indicate recent usage." (June 28, 2023 Tr. Vol. 3 at 361.) He further opined the concentration of cocaine found in appellant's blood, as well as "the behavior that was witnessed * * * right before the crash, would have impaired his ability * * * to some degree to safely operate a motor vehicle at the time of the crash." (June 28, 2023 Tr. Vol. 3 at 362.)

{¶ 22} David Cotter is a retired auto technician. On August 8, 2017, Cotter was in a vehicle traveling northbound on State Route 33. Cotter testified he observed "an SUV coming behind me quite away[] back, probably * * * ten, fourteen cars maybe. And all of the sudden he was right behind me." (June 28, 2023 Tr. Vol. 3 at 382.) He stated "the SUV came up behind me pretty close and then he swerved over to the right berm. I was in the right-hand lane. And he swerved over to the right berm and went around me, and cut back in front of me." (June 28, 2023 Tr. Vol. 3 at 383.) Cotter described the vehicle as "a Chevy - - I think it was a Tahoe or something like that. It was an SUV. Maroon in color." (June 28, 2023 Tr. Vol. 3 at 383.) After passing Cotter, the driver "cut back across in front of me, and * * * it was close enough I could see that it had [a] West Virginia license on it. * * * And he cut back across the front of me, across the left-hand land and down into the median, where he drove * * * probably a couple hundred yards I suppose." (June 28, 2023 Tr. Vol. 3 at 384.)

{¶ 23} Cotter stated the SUV was traveling on grass in the median, and the driver then came "back up on the road, and across both lanes back over to the right-hand berm." (June 28, 2023 Tr. Vol. 3 at 384.) Cotter "thought [the driver] was going to stop. And he was almost just a little farther north of where the ramp for Refugee Road would come down and he made a U-turn and started up the ramp after that." (June 28, 2023 Tr. Vol. 3 at 384-85.) Cotter "didn't know what happened until I watched the news the next morning." (June 28, 2023 Tr. Vol. 3 at 385.)

{¶ 24} During the events, Cotter "didn't actually see the driver until he started back, after [the driver] had come back across the road and was over on the berm before he made his U-turn to go back up the ramp." (June 28, 2023 Tr. Vol. 3 at 385-86.) When interviewed by police after the incident, Cotter described the driver as "a short-haired, white male." (June 28, 2023 Tr. Vol. 3 at 387.) Cotter saw "a glance" of the driver, but he "wouldn't say a real good look." (June 28, 2023 Tr. Vol. 3 at 387.) Cotter did not observe anyone else in the SUV except the driver.

{¶ 25} At the close of the state's case-in-chief, the parties stipulated that appellant was treated at Grant Medical Center "from August 8th of 2017 to August 12th of 2017," at which time he "reported right knee pain, right hip pain, and back pain"; he was diagnosed

with and "treated for multiple fractures to his right hip socket with dislocation or partial dislocation of the upper leg from the hip joint." (June 29, 2023 Tr. Vol. 4 at 437-38.)

{¶ 26} Appellant called one witness, Harry Plotnick, Ph.D., a consultant in forensic toxicology. Based on assumed facts presented by defense counsel regarding the incident, Dr. Plotnick opined: "I didn't find enough information upon which to base an opinion within a reasonable degree of scientific certainty that the individual's ability to operate a motor vehicle was impaired by cocaine." (June 29, 2023 Tr. Vol. 4 at 451-52.) He further testified: "I don't see anything else in the entire picture, the transportation to the hospital, the evaluation at the hospital, that support the finding of an effect of a stimulant drug like cocaine upon his performance. I didn't say it wasn't. I'm saying that there is not sufficient information * * * for me to give an opinion within a reasonable degree of scientific certainty that he was impaired by the drug." (June 29, 2023 Tr. Vol. 4 at 452.)

{¶ 27} Following deliberations, the jury returned verdicts finding appellant guilty on all nine counts. On July 5, 2023, the trial court conducted a sentencing hearing. By amended judgment entry filed August 15, 2023, the trial court sentenced appellant to 8 years on Count 1, 3 years on Count 3, 4 years on Count 5, 3 years on Count 7, and 6 months on Count 9, with all counts (except for Count 9) to be served consecutive to each other, for a total aggregate sentence of 18 years. The court merged Counts 2, 4, 6, and 8 for purposes of sentencing.

## II. Assignments of Error

{¶ 28} Appellant appeals and assigns the following two assignments of error for our review:

> I. The trial court's interjections demonstrated judicial bias, denying Mr. Hough his right to the due process of law. The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution; *State ex rel. Wise v. Chand*, 21 Ohio St.2d 113, 265 N.E.2d 613 (1970); *State v. Weaver*, 171 Ohio St.3d 429, 2022-Ohio-4371, 218 N.E.3d 806; Evid.R. 614(B).
>
> II. The trial court imposed a vindictive sentence after Mr. Hough's successful appeal. The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution; *North Carolina v. Pearce*, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969); *Alabama v. Smith*, 490 U.S. 794, 109 S.Ct. 2201, 104 L.Ed.2d 865 (1989).

### III. Analysis

{¶ 29}  Under his first assignment of error, appellant asserts the trial court, through questions interposed during retrial, demonstrated judicial bias.  Specifically, appellant argues such questions emphasized facts favorable to the prosecution and bolstered the credibility of the state's expert witnesses.

{¶ 30} Evid.R. 614(B) affords the trial court "discretion to decide whether or not to question a witness." *Yurkowski v. Univ. of Cincinnati*, 10th Dist. No. 11AP-974, 2013-Ohio-242, ¶ 60.  Under this rule, "a trial court is permitted to question witnesses called by a party as long as the questions are relevant and the questioning is done impartially." *In re Myers*, 3d Dist. No. 13-03-61, 2004-Ohio-539, ¶ 8.  Evid.R. 614(B) states: "The court may interrogate witnesses, in an impartial manner, whether called by itself or by a party."   The rule " 'exists because the trial court has an "obligation to control proceedings, to clarify ambiguities, and to take steps to insure substantial justice." ' " *State v. Skerkavich*, 8th Dist. No. 105455, 2019-Ohio-4973, ¶ 13, quoting *State v. Stadmire*, 8th Dist. No. 81188, 2003-Ohio-873, ¶ 26, quoting *State v. Kay*, 12 Ohio App.2d 38, 49 (8th Dist.1967).  Further, "pursuant to Evid.R. 611(A), the trial court has discretion to control the flow of the trial," and such control " ' "includes asking questions of the participants and the witnesses in a search for truth." ' " *Id.*, quoting *State v. Redon*, 8th Dist. No. 92611, 2009-Ohio-5966, ¶ 8, quoting *State v. Prokos*, 91 Ohio App.3d 39, 44 (4th Dist.1993), citing Evid.R. 614.  Accordingly, "[t]he right to question a witness, pursuant to Evid.R. 614(B), rests within the sound discretion of the trial court." *State v. Vanloan*, 12th Dist. No. CA2008-10-259, 2009-Ohio-4461, ¶ 8.

{¶ 31} The ability of the trial court "to question a witness is restrained by the requirement in Evid.R. 614(B) that the court must question impartially." *Brothers v. Morrone-O'Keefe Dev. Co., L.L.C.*, 10th Dist. No. 05AP-161, 2006-Ohio-1160, ¶ 12.  However, in the absence of " ' "any showing of bias, prejudice, or prodding of a witness to elicit partisan testimony, it will be presumed that the trial court acted with impartiality [in propounding to the witness questions from the bench] in attempting to ascertain a material fact or to develop the truth." ' " *Id.*, quoting *State v. Baston*, 85 Ohio St.3d 418, 426 (1999), quoting *Jenkins v. Clark*, 7 Ohio App.3d 93, 98 (2d Dist.1982).  Further, "[a] trial court's questioning of a witness is not deemed partial for purposes of Evid.R. 614(B) merely

because the evidence elicited during the interrogation was damaging to one of the parties." *Klasa v. Rogers*, 8th Dist. No. 83374, 2004-Ohio-4490, ¶ 32. Evid.R. 614(C) states that "[o]bjections to the calling of witnesses by the court or to interrogation by it may be made at the time or at the next available opportunity when the jury is not present."

{¶ 32} In the present case, appellant did not object to the trial court's questions posed at trial, and therefore "our review is for plain error only, as assertions of structural error do not preclude an appellate court from applying the plain-error standard when the accused has failed to object." *State v. West*, 168 Ohio St.3d 605, 2022-Ohio-1556, ¶ 28, citing *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, ¶ 24. Under the plain error standard, "the defendant bears the burden of 'showing that but for a plain or obvious error, the outcome of the proceeding would have been otherwise, and reversal must be necessary to correct a manifest miscarriage of justice.' " *Id.* at ¶ 22, quoting *State v. Quarterman*, 140 Ohio St.3d 464, 2014-Ohio-4034, ¶ 16. Under Ohio law, "[p]lain error should be invoked with utmost caution, only under exceptional circumstances to prevent a miscarriage of justice." *State v. King*, 2d Dist. No. 24141, 2011-Ohio-3417, ¶ 11, citing *State v. Jenks*, 61 Ohio St.3d 259, 282 (1991).

{¶ 33} Appellant first contends that questions posed by the trial court to two witnesses, paramedic Duke and Officer Perez, emphasized undisputed facts. Regarding the testimony of Duke, the record indicates the prosecutor questioned this witness on direct examination regarding treating one of the accident victims who was having difficulty breathing. Duke testified that paramedics initially attempted to insert an "oral pharyngeal airway," and "also tried to needle compress the patient." (June 26, 2023 Tr. Vol. 1 at 83.) At that point, the trial court asked the witness to "explain the procedure," and the witness provided an explanation regarding the insertion of a needle into the "pleural cavity." (June 26, 2023 Tr. Vol. 1 at 83-84.)

{¶ 34} While appellant characterizes the trial court's inquiry as seeking to emphasize a fact not in dispute, the record reflects the court requested the witness to explain/clarify a procedure referenced by the witness, and such inquiry was relevant to the testimony and within the parameters of Evid.R. 614(B). Further, despite appellant's contention that the inquiry resulted in the witness providing a "gruesome description," the "mere fact that the evidence elicited by a trial court's questioning is potentially damaging to a party does not

show a bias." *Holt v. Feron*, 3d Dist. No. 9-17-43, 2018-Ohio-3318, ¶ 21, citing *State v. Lowe*, 9th Dist. No. 25862, 2012-Ohio-907, ¶ 19.

**{¶ 35}** During the direct testimony of Officer Perez, the state introduced photographs depicting the scene of the collision involving the two vehicles. The prosecutor, in questioning the witness about one of the photographs, inquired: "[I]f you have this view, are you driving in the right way or the wrong way in this photograph?" (June 27, 2023 Tr. Vol. 2 at 269.) The witness responded: "If you are looking in that view, you are driving the correct way." (June 27, 2023 Tr. Vol. 2 at 269.) The trial court then asked the witness: "[A]re you saying that [the] Tahoe would have come up this ramp the wrong way and around the curve?" (June 27, 2023 Tr. Vol. 2 at 270.)

**{¶ 36}** While the record indicates, as argued by appellant, it was undisputed the Tahoe was traveling the wrong way on the ramp, the court's inquiry, in context, reflects an attempt to clarify the witness' testimony regarding the direction of travel of the subject vehicles as depicted in a displayed photograph. In this respect, "questions posed for the purpose of clarifying material facts do not qualify as improper examination." *O'Brien v. Phillips*, 10th Dist. No. 14AP-1026, 2015-Ohio-3901, ¶ 29, citing *King* at ¶ 13.

**{¶ 37}** Appellant also argues questions posed by the trial court bolstered the credibility of prosecution expert witnesses. Appellant first contends the court, on several occasions, asked witnesses to explain their training or accreditations.

**{¶ 38}** The record indicates the prosecutor, during direct examination of paramedic Duke, asked this witness: "What training did you go through to prepare you for your work?" (June 27, 2023 Tr. Vol. 2 at 77.) Duke responded: "I went through Firefighter I, Firefighter II, EMT Basic, and EMT paramedic." (June 27, 2023 Tr. Vol. 2 at 77.) The court then asked the witness: "Can you explain that to the jury, what all that means?" (June 27, 2023 Tr. Vol. 2 at 77.) During direct examination of forensic toxicologist Baldauf, in response to an inquiry by the prosecutor as to whether "the OSP Crime Lab that you work for [is] accredited in any way," Baldauf responded the lab is "accredited through ANAB." (June 27, 2023 Tr. Vol. 2 at 100.) The court then inquired: "What does [that] mean?" (June 27, 2023 Tr. Vol. 2 at 101.)

**{¶ 39}** Appellant has failed to show plain error based on the above inquiries. In general, a trial court performs "a 'gatekeeping' role" regarding the qualification and

relevancy of expert testimony. *Abon, Ltd. v. Transcontinental. Ins. Co.*, 5th Dist. No. 2004-CA-0029, 2005-Ohio-3052, ¶ 58. A review of the subject questions, i.e., requests to explain the meaning of certain designations or accreditations, indicates the trial court sought to elicit additional relevant information, and the questions posed did not suggest an opinion about witness credibility or exhibit partiality. As observed by one court, there is a difference between "objectively" referencing a witness' "qualifications to answer a question" as opposed to suggesting the testimony of a witness "is to be given enhanced weight and credibility" because of such qualifications. *United States v. Laureano-Perez*, 797 F.3d 45, 54 (1st Cir.2015).

{¶ 40} Appellant next contends the trial court erred when it "implored two of the prosecution's expert witnesses that their opinions *will* be given to a reasonable degree of medical or scientific certainty." (Emphasis sic.) (Appellant's Brief at 18.)

{¶ 41} During the testimony of forensic pathologist Daniels, the trial court inquired of the witness: "And will you make sure all of your opinions are based upon a reasonable degree of medical certainty and probability?" (June 27, 2023 Tr. Vol. 2 at 209.) The witness responded: "That is correct." (June 27, 2023 Tr. Vol. 2 at 209.) During the testimony of toxicologist Topmiller, the trial court, in a like manner, noted the requirement that all opinions "be based upon a reasonable degree of forensic and scientific accuracy." (June 28, 2023 Tr. Vol. 3 at 361.) No objection was raised by appellant to this line of inquiry/comment.

{¶ 42} In *R.T. v. Knobeloch*, 10th Dist. No. 16AP-809, 2018-Ohio-1596, ¶ 60, this court addressed a similar contention in which the appellant therein challenged the following inquiry by the trial court of the appellees' expert witness: "When you give opinions, Doctor, you have to make sure all of your opinions are to a reasonable degree of medical certainty and probability, i.e., 51 percent or more likely. Will you make sure that all your opinions are within that degree?" In rejecting appellant's claim of bias or prejudice from this type of inquiry, this court observed the trial court "was clarifying under what circumstances [the expert] was permitted to express his medical opinion," and that the court "reminded" the expert witness "he was limited to opinions supported by a reasonable degree of medical certainty and probability." *Id.* We held that such "clarification can be interpreted as beneficial to [the] appellants as well as the appellees." *Id.*

{¶ 43} As alluded to by this court in *Knobeloch*, stating an expert opinion to a reasonable degree of certainty is a requirement of Ohio law. *See also State v. English*, 77 Ohio App.3d 371, 381 (10th Dist.1991) ("An expert's opinion generally is competent only if the expert holds that opinion to a reasonable degree of scientific certainty."). Upon review, and in accordance with *Knobeloch*, appellant has failed to demonstrate plain error or prejudice by the trial court regarding this line of inquiry.

{¶ 44} Finally, appellant contends that several questions posed by the trial court to witnesses regarding the effect of cocaine on impairment were not impartial. During direct testimony of Topmiller, the prosecutor asked Topmiller whether "the term 'impaired his ability' to safely operate a motor vehicle * * * means unfit to drive?" (Tr. Vol. 3 at 362.) In response, Topmiller stated: "Yes. I'm saying that based on the identification of cocaine that was found in his blood and the high risk driving behavior that was exhibited by him immediately prior to the crash, in my opinion would lead me to stating that I'd expect some degree of impairment from - - that he be exhibiting some degree of impairment because of that at the time of the crash." (Tr. Vol. 3 at 362-63.) At that point, the trial court inquired: "Because of the cocaine?" (June 28, 2023 Tr. Vol. 3 at 363.) The witness responded: "Because of the cocaine, yes." (June 28, 2023 Tr. Vol. 3 at 363.)

{¶ 45} Appellant has failed to show plain error. A review of the above exchange, in context, indicates the trial court's inquiry was to clarify the witness' response. Again, such inquiry is proper under Evid.R. 614(B). *See, e.g., Elias v. Macek*, 8th Dist. No. 78828 (Oct. 25, 2001) (No abuse of discretion by trial court under Evid.R. 614(B) where questions of trial court demonstrated attempt to "impartially clarify what it believed was incomplete or confusing testimony.").

{¶ 46} Appellant also argues the framing of the trial court's questions posed to appellant's expert, Dr. Plotnick, improperly "promoted the notion that [appellant] was impaired by cocaine." (Appellant's Brief at 22.)

{¶ 47} During direct examination of Dr. Plotnick, counsel for appellant requested the witness to assume certain facts as true. Based on those assumed facts, Dr. Plotnick opined there was insufficient evidence for him "to give an opinion within a reasonable degree of scientific certainty that [appellant] was impaired by the drug." (June 29, 2023 Tr. Vol. 4 at 452.) Also on direct, the witness was questioned about the prior testimony of

the state's toxicologist, Topmiller, and Dr. Plotnick noted his disagreement with Topmiller as to whether certain factors were relevant to the issue of impairment. On cross-examination, the prosecutor questioned Dr. Plotnick about the effects of cocaine on an individual, including inquiries about "stimulation" and "depressive" stages. (June 29, 2023 Tr. Vol. 4 at 457.)

{¶ 48} The record indicates that, following direct and cross-examination of Dr. Plotnick, the trial court asked several follow-up questions of the witness related to the issue of impairment in general, including whether an individual who ingests cocaine can "exhibit signs of paranoia," and whether cocaine "can * * * impair a person's ability to drive." (June 29, 2023 Tr. Vol. 4 at 459.) The court also asked the witness whether his testimony as to "things that you talked about in the urine[] would * * * be metabolites that had been processed through the system." (June 29, 2023 Tr. Vol. 4 at 460.)

{¶ 49} Upon review, the questions posed by the trial court, which were arguably relevant, did not display partiality and "did not 'indicate to the jury its opinion on the evidence.' " *State v. Phelps*, 8th Dist. No. 51520 (Dec. 18, 1986), quoting *State ex rel. Wise v. Chand*, 21 Ohio St.2d 113, 119 (1970). *See also State v. Roark*, 12th Dist. No. CA2012-04-036, 2013-Ohio-217, ¶ 37 (trial court's questions did not go beyond the parameters of Evid.R. 614(B) where "tenor and nature of the court's questions did not indicate that it was expressing an opinion as to the evidence"); *State v. Johnson*, 10th Dist. No. 03AP-1103, 2004-Ohio-4842, ¶ 11 (trial court's "follow-up questions" to witness were proper as "designed to assist the jury's search for the truth" and did not reflect an assessment of the credibility of the witness or the evidence).

{¶ 50} We note that, following the trial court's inquiries, the court afforded both sides the opportunity to ask further questions of Dr. Plotnick, and the record indicates both the defense and prosecution asked follow-up questions. We also note the trial court provided the following curative instruction at trial:

> If during the course of the trial, I said or did anything that you consider an indication of my view of the facts, you're instructed to disregard it. I ask questions during every trial. Take no - - take no concern about why I may have asked a question. It's not for me to decide anything about the facts of this case. It's up to you.

(June 29, 2023 Tr. Vol. 4 at 539.)

{¶ 51} Under Ohio law, "[a] jury is presumed to follow the instructions, including curative instructions, given it by a trial judge." *State v. Garner*, 74 Ohio St.3d 49, 59 (1995). Ohio courts, including this court, have held such an instruction acts to minimize the risk of potential prejudice from questions posed by a trial court. *See State v. West*, 10th Dist. No. 19AP-90, 2020-Ohio-3434, ¶ 17 (although the appellant failed to demonstrate plain error as a result of trial court's questions, "any arguable problem was cured by the trial court's curative instruction"); *State v. Wilbon*, 8th Dist. No. 82934, 2004-Ohio-1784, ¶ 17 (even assuming jury had impression trial judge was not impartial, trial judge issued proper curative instruction to jury).

{¶ 52} On the record presented, appellant has failed to show plain error or that the trial court's questions or remarks deprived him of the right to a fair trial. Accordingly, appellant's first assignment of error is not well-taken and is overruled.

{¶ 53} Under his second assignment of error, appellant contends the trial court imposed a vindictive sentence following his successful appeal to the Supreme Court. Appellant argues that, because he received a harsher sentence on resentencing from the same trial judge after a successful appeal, his new sentence (which was three years longer than the sentence he received after the first trial) is presumed vindictive. Appellant further contends the trial court's stated reasons for imposing an increased sentence were pretextual.

{¶ 54} In general, "[a] court may impose a different sentence when a defendant is again convicted after a retrial." *State v. Kincaid*, 6th Dist. No. L-08-1163, 2009-Ohio-3211, ¶ 11, citing *State v. Howard*, 174 Ohio App.3d 562, 2007-Ohio-4334 (2d Dist.); *N. Carolina v. Pearce*, 395 U.S. 711 (1969), *overruled on other grounds*, *Alabama v. Smith*, 490 U.S. 794 (1989). However, "[t]he Due Process Clause of the Fourteenth Amendment requires * * * that vindictiveness against a defendant for having successfully attacked his first conviction must play no part in the sentence he receives after a new trial." *Id.*, citing *Pearce* at 725. In order to assure the absence of "any such retaliatory motivation" on the part of a sentencing court, "whenever a judge imposes a more severe sentence upon a defendant after a new trial, the reasons for the judge's doing so must affirmatively appear and the factual data upon which the increased sentence is based must be made part of the record

for purposes of reviewing the constitutionality of the increased sentence." *Id.*, citing *Pearce* at 726.

{¶ 55} In *Wasman v. United States*, 468 U.S. 559, 568 (1984), the United States Supreme Court observed: "If it was not clear from the Court's holding in *Pearce*, it is clear from our subsequent cases applying *Pearce* that due process does not in any sense forbid enhanced sentences or charges, but only enhancement motivated by *actual vindictiveness* toward the defendant for having exercised guaranteed rights." (Emphasis sic.) The term " '[a]ctual vindictiveness' implies an animus against a defendant because he or she exercised his or her right of appeal which resulted in the reversal of the prior conviction based upon an error made by the sentencing judge." *Kincaid* at ¶ 12, quoting *Howard* at ¶ 17. Therefore, "[b]y operation of law, an enhanced or increased sentence, by the same sentencer, after a new trial and conviction, creates a rebuttable presumption of actual vindictiveness." *Id.*, citing *Wasman* at 568-69, citing *Pearce.*

{¶ 56} In order to overcome the presumption of vindictiveness, a trial court "must make affirmative findings on the record regarding conduct or events that occurred or were discovered after the original sentencing." *State v. Davis*, 2d Dist. No. 2006 CA 69, 2007-Ohio-1030, ¶ 25, citing *Pearce* at 726; *Wasman.* Under *Pearce*, a trial court is required to "make findings based upon objective information concerning identifiable conduct on the part of the defendant." *Id.*, citing *Pearce* at 726. *See also State v. Hitchcock*, 5th Dist. No. 19-CA-56, 2020-Ohio-6751, ¶ 26, quoting *Texas v. McCullough*, 475 U.S. 134, 142-43 (1986) (The presumption of vindictiveness "may be overcome with any objective information that justifies an increased sentence," including "a trial court's discovery of 'new, probative evidence supporting a longer sentence.' "). Further, "[s]uch information may come to the judge's attention from evidence adduced at the second trial itself, from a new presentence investigation, from the defendant's prison record, or possibly from other sources." *Pearce* at 723. In this respect, " '[r]elevant conduct or events' sufficient to overcome the presumption of vindictiveness are those that throw 'new light upon the defendant's "life, health, habits, conduct, and mental and moral propensities." ' " *Davis* at ¶ 26, quoting *Wasman* at 570-71, quoting *Williams v. New York*, 337 U.S. 241, 245 (1949).

{¶ 57} In the present case, it is undisputed the trial court stated on the record reasons as to why it was imposing a harsher sentence. During the resentencing hearing,

the court acknowledged "the law says for me to increase [appellant's] sentence, it's presumed that I'm being vindictive. So in order to overcome the presumption of vindictiveness in the law, I have to make findings and I have to make those findings part of the record." (July 5, 2023 Sentencing Tr. at 28.) The trial court further recognized "the *Pearce* case permits a sentencing authority to justify an increased sentence by affirmatively identifying relevant conduct or events that occurred subsequent to the original sentencing proceedings." (July 5, 2023 Sentencing Tr. at 28.)

{¶ 58} The trial court initially addressed the court's "Exhibit A," appellant's institutional report summary, which listed disciplinary infractions during his incarceration since 2019. In reviewing the report's infraction summary, the court noted "one, two, three, four, five times that he refused to take medications." (July 5, 2023 Sentencing Tr. at 29.) On another occasion, prison officials discovered "contraband in his cell." (July 5, 2023 Sentencing Tr. at 29.) With respect to one of the infractions, the trial court observed: "[Appellant] was given a direct order and he said, 'I don't want to.' So he had to be cuffed up. He was arguing. He finally complied. And he has had repeated offenses. Those are all documented. 6-27-21, 6-14-21, 5-23-20, 2-3-20." (July 5, 2023 Sentencing Tr. at 29.) The trial court also "note[d]" that appellant participated in "no [prison] programming. Nothing." (July 5, 2023 Sentencing Tr. at 29.)

{¶ 59} The trial court next addressed the court's "Exhibit B," the forensic evaluation of Dr. Silber, dated February 2, 2023. (July 5, 2023 Sentencing Tr. at 30.) The court cited Dr. Silber's "conclusion * * * that [appellant] malingered, faked, malingered." (July 5, 2023, Sentencing Tr. at 30.) The trial court also reviewed court "Exhibit C," the report of Dr. O'Reilly, based on an evaluation conducted on March 30, 2023. (July 5, 2023 Sentencing Tr. at 33.) The court noted Dr. O'Reilly found appellant "clearly malingered symptoms of mental illness during his prior competency evaluation and during this evaluation. He intentionally attempted to portray himself as ignorant or incompetent on psychological testing." (July 5, 2023 Sentencing Tr. at 34.) Regarding those exhibits, the trial court observed: "These are all subsequent to the prior sentencing, so the Court can only believe that he has intentionally malingered, intentionally faked these results." (July 5, 2023 Sentencing Tr. at 35.)

{¶ 60} The trial court also cited "further information regarding all the victims of this case. Further effects, traumatic effects, that it's had on them, some of which the Court knew about, others that have become more aggravated." (July 5, 2023 Sentencing Tr. at 35-36.) During the resentencing proceeding, the court heard victim impact testimony that "the harm" caused by appellant is "far greater than we were aware of at your first sentencing in 2019." (July 5, 2023 Sentencing Tr. at 23.) The victim impact testimony included statements regarding Amanda, who had committed suicide subsequent to the first trial, and statements regarding both minor children. The court noted it "cannot directly contribute Amanda's suicide to [appellant], but the fact she committed suicide certainly had to be at least indirectly related to what happened to her and the fact that she was taking opioids." (July 5, 2023 Sentencing Tr. at 36.) Finally, the trial court found appellant "has never, ever accepted responsibility one iota. No remorse whatsoever. No sympathy. It's almost unbelievable to me. In fact, it's one of the worst cases I've ever seen of somebody trying to get out of a situation and not accepting any responsibility whatsoever." (July 5, 2023 Sentencing Tr. at 36.)

{¶ 61} Appellant does not dispute the trial court gave reasons for the sentence following retrial. Appellant argues, however, the reasons cited by the trial court were either known at the time of the original sentencing or do not reflect new information about appellant's character or conduct. The record on resentencing, however, belies this contention. As set forth above, the trial court cited identifiable conduct occurring subsequent to the time of the original sentencing, including disciplinary incidents set forth in the institutional report summary and the results of psychological testing of appellant following his first trial indicating he intentionally malingered during two evaluations of his competency to stand trial. Thus, the record reflects the trial court was presented with new information that "shed new light upon [appellant's] 'conduct, and mental and moral propensities.' " *State v. Seymour*, 12th Dist. No. CA2014-03-081, 2015-Ohio-1086, ¶ 5, quoting *Pearce* at 723, quoting *Williams* at 245.

{¶ 62} Appellant seeks to minimize the exhibit evidence presented at the resentencing hearing, arguing that his prison disciplinary record involved minor infractions and further asserting that, despite conclusions by Drs. Silber and O'Reilly that he malingered and was competent to stand trial, "the record in this case is not so clear-cut."

(Appellant's Brief at 30.)  The trial court, however, could have properly relied on the report of Dr. Silber, who opined that appellant "malingered throughout the evaluation," as well as the report of Dr. O'Reilly who opined, based on his evaluation of appellant, that "he malingered symptoms of mental illness" and "intentionally performed poorly on psychological tests assessing his competency to stand trial." (Court's Ex. B at 1; Ex. C at 14.)

**{¶ 63}** Upon review, the trial court affirmatively stated its reasons for the sentence imposed based on objective information concerning identifiable "conduct or events that occurred subsequent to the original sentencing proceedings," including appellant's history of institutional disciplinary infractions and the court's view that he malingered, i.e., was dishonest, during evaluations to avoid responsibility for his actions. *Wasman* at 572.

**{¶ 64}** Further, this new objective information "thoroughly rebutted" any presumption of vindictiveness.  *Seymour* at ¶ 6-7 (information set forth in the defendant's institutional summary report and prison incident reports, relied on by trial court as the basis of increased sentence, rebutted presumption of vindictiveness).  *See also State v. Johnson*, 2d Dist. No. 23297, 2010-Ohio-2010, ¶ 14 (appellant's prison records, reflecting his "offense history while incarcerated," provided trial court "with objective, non-vindictive reasons" for imposing longer prison sentence); *State v. King*, 9th Dist. No. 10CA009755, 2010-Ohio-4400, ¶ 53 (trial court's imposition of greater sentence upon resentencing not based on vindictiveness where court "affirmatively stated its reasons for increasing [the appellant's] sentence" based on consideration of prison infractions occurring after time of original sentence); *State v. Mockbee*, 4th Dist. No. 14CA3601, 2014-Ohio-4493, ¶ 14, *vacated on other grounds* (evidence of the appellant's five prison infractions, including possession of contraband, following second trial "sufficient to rebut the presumption of vindictiveness"); *State v. Johnson*, 2d Dist. No. 18937, 2002-Ohio-4339, ¶ 21 (no evidence that harsher sentence was the product of judicial vindictiveness where re-sentencing entry "pointed to facts occurring after initial sentencing * * * as justification," including "the defendant's continuing lack of remorse, his failure to seek assistance for his problem with drug and alcohol dependence, and the continuing and extensive psychological injury to the victims").

**{¶ 65}** Appellant's further contention that the trial court's stated reasons for the increased sentence were pretextual is not persuasive.  In support, appellant points to

several comments by the trial court, including one made during a preliminary hearing in which the court noted appellant's prior "counsel 'never once said he was incompetent during the trial,' " as well as a comment in which the court "criticized" appellant's former counsel for having "waited so long" to bring the issue of competency to the court's attention. (Appellant's Brief at 36-37.)

{¶ 66} Appellant's attempt to portray the trial court's reasons for the increased sentence as pretextual, i.e., based on actual vindictiveness, is not persuasive. In this respect, it has observed that " '[t]he existence of a retaliatory motive would * * * be extremely difficult to prove in any individual case.' " (Footnote omitted.) *United States v. Singletary*, 75 F.4th 416, 427 (4th Cir.2023), quoting *Pearce* at 725. While appellant cites to several comments by the trial court that may have reflected frustration over the course of the proceedings, a review of the record indicates any such "personal commentary was unrelated to the new sentence." *State v. Watson*, 5th Dist. No. 22-COA-027, 2023-Ohio-1469, ¶ 36. Rather, as previously addressed, the record indicates the trial court was presented with "new information which cast new light on [the appellant's] conduct, mental and moral propensities." *Id*. *See also Singletary* at 427, quoting *Wasman* at 572 (while "it is possible – though unlikely – that a case could arise in which a * * * court's stated reasons for an increased sentence are so facially implausible [or] pretextual * * * that they cannot rebut the presumption of vindictiveness," such is not the case where the court "extensively justified its higher sentence by reference to material, legitimately aggravating 'conduct [and] events that occurred subsequent to the original sentencing' ").

{¶ 67} Because the trial court stated on the record objective, non-vindictive reasons justifying the increased sentence, and in the absence of evidence of actual vindictiveness, appellant has failed to demonstrate a due process violation. Accordingly, appellant's second assignment of error is not well-taken and is overruled.

## IV. Conclusion

{¶ 68} Based on the foregoing, appellant's two assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is hereby affirmed.

*Judgment affirmed.*

LUPER SCHUSTER and BEATTY BLUNT, JJ., concur.